Steven Michael WOODS, a/k/a
Halo, Appellant,

v.

The STATE of Texas.

No. AP–74430.

Court of Criminal Appeals of Texas,
En Banc.

Dec. 15, 2004.

William Reagan Wynn, Fort Worth, for Appellant.

Kathleen A. Walsh, Asst. District Attorney, Denton, Matthew Paul, State's Attorney, Austin, for State.

## *OPINION*

PRICE, J., delivered the opinion of the Court, in which KELLER, P.J., MEYERS, JOHNSON, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined.

In August 2002, a Denton County jury convicted the appellant, Steven Michael Woods, of killing Ronald Whitehead and Bethena Brosz.[1] Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e), the trial court sentenced the appellant to death.[2] Direct appeal to this Court is automatic.[3] The appellant raises seventeen points of error challenging his conviction and sentence. We will affirm.

## I. VOIR DIRE

In points of error fifteen, sixteen, and seventeen, the appellant argues that the trial court improperly restricted his questioning of prospective jurors during voir dire. He contends that, as a result, he was unable to intelligently exercise peremptory challenges and challenges for cause.

The trial court has broad discretion over the jury selection process.[4] Voir dire could go on indefinitely if the trial court did not have the ability to impose reasonable limits on it.[5] A trial court abuses its discretion only when it prohibits a proper question about a proper area of inquiry.[6] A question is proper if it seeks to discover a juror's views on an issue applicable to the case.[7] However, an otherwise proper question is impermissible if it attempts to commit the juror to a particular verdict based on particular facts.[8] A voir dire question that is so vague or broad in nature as to constitute a global fishing expedition is also improper and may be prevented by the trial court.[9]

### A. Commitment Question

The appellant asserts in point of error fifteen that the trial court improper-

---

1. TEX. PEN.CODE § 19.03(a).

2. TEX CODE CRIM. PROC. art. 37.071, § 2(g).

3. *Id.*, at § 2(h).

4. *Sells v. State*, 121 S.W.3d 748, 755–56 (Tex. Crim.App.), *cert. denied*, 540 U.S. 986, 124 S.Ct. 511, 157 L.Ed.2d 378 (2003); *Barajas v. State*, 93 S.W.3d 36, 38–39 (Tex.Crim.App. 2002).

5. *Ibid.*

6. *Ibid.*

7. *Ibid.*

8. *Ibid.; Standefer v. State*, 59 S.W.3d 177, 181 (Tex.Crim.App.2001).

9. *Sells*, 121 S.W.3d at 756; *Barajas*, 93 S.W.3d at 39.

ly limited his voir dire questioning of venire member Kerri Denise Wyrick during the following exchange:

Q. And it mentions on there if you find sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed. It says "sufficient mitigating circumstance or circumstances." So do you understand that to mean that even one mitigating circumstance, if it's sufficient, is enough to award a life penalty instead of a death penalty?

A. I understand.

Q. Could you do that even if you'd already found a defendant guilty beyond a reasonable doubt of committing a capital murder, you'd found special issue number 1, that the State proved that beyond a reasonable doubt, that you found on special issue number 2 that the State proved that beyond a reasonable doubt? If the State did all that, could you still support and vote for a life punishment if you found a sufficient mitigating circumstance?

[PROSECUTOR]: I object to contracting.

THE COURT: Sustained, the way it's phrased.

Q. Would you be able to follow the law as to special issue number 3 if you found even one sufficient mitigating circumstance?

A. Yes.

Defense counsel did not exercise a challenge for cause or a peremptory challenge against Wyrick, and she was seated on the jury.

■ The appellant argues that the question was proper because it sought to discover Wyrick's views on an issue applicable to the case, that is, whether she could fairly consider the mitigation special issue even if the jury had already answered yes to the future dangerousness and anti-parties special issues.[10] The trial court sustained the State's objection that it was an improper commitment question.[11] A commitment question can be proper or improper, depending on whether the question leads to a valid challenge for cause.[12] For a commitment question to be proper, one of the possible answers to that question must give rise to a valid challenge for cause.[13] If Wyrick had answered the question "no," then she would have been challengeable for cause.[14] Thus, the trial court erred in refusing to allow the question to be asked.

■ The appropriate standard of harm is to disregard the error unless a substantial right has been affected.[15] A substantial right is affected when the error has a

10. TEX.CODE CRIM. PROC. art. 37.071, § 2(e)(1).

11. We understand the prosecutor's "contracting" objection to mean that the question improperly attempted to commit Wyrick to a particular verdict based on particular facts.

12. *Lydia v. State,* 109 S.W.3d 495, 498 (Tex. Crim.App.2003) (citing *Standefer,* 59 S.W.3d at 181).

13. *Standefer,* 59 S.W.3d at 182.

14. TEX.CODE CRIM. PROC. art. 35.16(c)(2).(providing that the defense may challenge a veni-

reperson for cause if "he has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof or of the punishment therefor").

15. TEX. R APP. P. 44.2(b); *see Jones v. State,* 982 S.W.2d 386, 391–94 (Tex.Crim.App.1998) (holding question of harm in voir dire context addressed under Rule 44.2(b)).

substantial and injurious effect or influence in determining the jury's verdict.[16]

The trial court's denial of a proper question in this case did not have a substantial or injurious effect or influence in determining the jury's verdict because defense counsel was able to ask Wyrick essentially the same question. After the trial court sustained the State's objection, defense counsel immediately asked her, "Would you be able to follow the law as to special issue number 3 if you found even one sufficient mitigating circumstance?" and she replied, "Yes." Point of error fifteen is overruled.

### B. Improper Questions

The appellant complains in point of error sixteen that the trial court prevented him from asking venire member Michael Rudolf Ziegler the following question: "Could you be fair and impartial in a murder case where the people killed were under 25 years of age?" The prosecutor objected that the question was "contracting," and the trial court sustained the objection. Defense counsel exercised a peremptory strike against Ziegler.

The appellant similarly asserts in point of error seventeen that the trial court improperly limited his voir dire questioning of venire member Jerry Linsley during the following exchange:

Q. Can you be impartial in this case if the victims were young?

[PROSECUTOR]: Objection, contracting.

THE COURT: Sustained.

Q. Can you consider the life penalty where the victims were young?

[PROSECUTOR]: Objection, contracting. He's trying to get him to commit to a certain set of facts, being that the victims were young.

THE COURT: Sustained.

Q. Can you be impartial if one of the victims is a young woman?

[PROSECUTOR]: Objection. Contracting again.

THE COURT: Sustained.

Q. Can you consider the life penalty if a victim was a young woman?

[PROSECUTOR]: Objection. Contracting.

THE COURT: Sustained.

Defense counsel then said that he wanted to ask the same four questions of every venire member. He asked the trial court for a running objection with regard to all subsequent jurors. The trial court replied: "Well, I've sustained the objection on this juror, and if the exact same question were asked of subsequent jurors, the Court's ruling would be the same." Defense counsel did not exercise a challenge for cause or a peremptory strike against Linsley, and he was seated on the jury.

The questions that the appellant sought to ask Ziegler, Linsley, and the other venire members in this case are similar to the questions that we held to be improper in *Barajas v. State*.[17] In *Barajas*, defense counsel desired to ask whether venire members could be impartial in an indecency case involving a victim who was eight to ten years old or, in the alternative, a victim who was nine years old.[18] Defense counsel also sought to ask whether venire members could consider probation in a case involving a victim who was eight to ten years old.[19] We held in *Barajas* that

16. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim.App.1997).

17. 93 S.W.3d 36 (Tex.Crim.App.2002).

18. *Id.,* at 38.

19. *Ibid.*

these questions constituted global fishing expeditions and the trial court was within its discretion to prevent defense counsel from asking them.[20] The trial court did not abuse its discretion in preventing a similar fishing expedition in the instant case. Points of error sixteen and seventeen are overruled.

## II. LIMITED CROSS–EXAMINATION

■ In points of error seven and eight, the appellant argues that the trial court improperly prevented him from cross-examining the State's witness Brian Young about his prison sentence and his prospects for parole. At the time of the appellant's trial, Young was serving a sentence for aggravated assault. Prior to calling Young to testify, the prosecutor made an oral motion in limine seeking to bar defense counsel from questioning Young about the fact that he was currently in custody and about the length of his sentence. The trial court granted the motion in limine and permitted defense counsel to question Young about the specifics of his conviction outside the presence of the jury for purposes of the record. In response to defense counsel's questions, Young testified that he had served nearly eight months of his two-year sentence and that he was aware of the possibility that he could be placed on parole, but that no one promised him anything in exchange for his testimony. When defense counsel asked Young if he expected "some kind of favorable treatment or good time" in exchange for his testimony, he responded: "From my understanding, my case does not merit good time because it is an aggravated

charge, and as for the rest of that, I have absolutely no idea." The following exchange took place after defense counsel finished questioning Young:

THE COURT: Is it your position that you intend to try to ask those questions in front of the jury?

[DEFENSE COUNSEL]: It is, Judge.

THE COURT: Is there an objection from the State?

[PROSECUTOR]: We object, Your Honor. Irrelevant, improper impeachment under 609, and there are no offers or agreements in exchange for his testimony.

THE COURT: I'm going to sustain the objection. The record has been made.

[DEFENSE COUNSEL]: Yes, ma'am.

The appellant argues on appeal that the limitation on his cross-examination of Young violated his rights under the Confrontation Clause of the Sixth Amendment and Rule 613(b) of the Texas Rules of Evidence.

■ The proponent of evidence to show bias must show that the evidence is relevant. The proponent does this by demonstrating that a nexus, or logical connection, exists between the witness's testimony and the witness's potential motive to testify in favor of the other party.[21] We have found a nexus when a witness has been indicted or is serving a period of community supervision.[22] In such cases, the witness is placed in a vulnerable position and may have a motive to testify in favor of the State.

20. *Id.,* at 41–42.

21. *Carpenter v. State,* 979 S.W.2d 633, 634 (Tex.Crim.App.1998).

22. *Maxwell v. State,* 48 S.W.3d 196, 199 (Tex. Crim.App.2001) ("Evidence that a witness whom the State calls is subject to a criminal charge, or is on probation, can be used to show the bias or interest of the witness in helping the State") (quoting *Moreno v. State,* 22 S.W.3d 482, 485–86 (Tex.Crim.App.1999)).

In this case, the appellant asked Young if he expected favorable treatment or good time in exchange for his testimony. Young said that he was ineligible for good time and that he had no idea about other potential favorable treatment. And, in fact, Young was ineligible for good time.[23] There was no indication that Young had the expectation that he would be rewarded for testimony favorable to the State or punished for testimony that was unfavorable to the State. The appellant's offer of proof did not establish a nexus between Young's testimony and his prison sentence.

Points of error seven and eight are overruled.

## III. ADMISSION OF EVIDENCE

In points of error nine, ten, eleven, and twelve, the appellant argues that the trial court erred in admitting the testimony of David Samuelson and Staci Schwartz. The appellant specifically complains that these two witnesses improperly testified about statements made to them by the appellant's co-defendant, Marcus Rhodes. The appellant argues that the trial court improperly admitted this evidence under the "statement against interest" exception to the hearsay rule in Texas Rule of Evidence 803(24). He also asserts that the admission of this evidence violated his rights under the Sixth Amendment's Confrontation Clause.

The State presented evidence that the appellant and Rhodes shot Ronald Whitehead and Bethena Brosz in a secluded area in The Colony, Texas, in the early morning hours of May 2, 2001.[24] The appellant, Rhodes, Whitehead, Samuelson, and Schwartz all knew each other from Insomnia, a coffee shop they frequented in downtown Dallas. Samuelson testified that he had talked to Rhodes at Insomnia on the evening of May 1, and Rhodes stated that "he had a job to do" for the appellant that night and that he did not want to do it. Schwartz testified that she had had a conversation with Rhodes at Insomnia on the afternoon of May 2, during which Rhodes stated that he and the appellant had used Brosz's credit card to make an online purchase of tickets to an anime festival. Rhodes told Schwartz that they had attempted to make Samuelson look responsible for the murders by buying the tickets in his name and having them sent to his house.

### A. Rule of Evidence 803(24)

In order for a declaration against interest to be admissible under Rule 803(24), the statement must be self-inculpatory with corroborating circumstances to indicate the trustworthiness of the statement.[25] The appellant does not assert that Rhodes's statements were insufficiently self-inculpatory. He instead argues that there was insufficient corroboration of Rhodes's statements. The corroboration must clearly indicate the trust-

---

23. *See* TEX. GOV'T CODE § 508.145(d) ("An inmate serving a sentence for an offense described by Section 3g(a)(1)(A), (C), (D), (E), (F), (G), or (H), Article 42.12, Code of Criminal Procedure, or for an offense for which the judgment contains an affirmative finding under Section 3g(a)(2) of that article, is not eligible for release on parole until the inmate's actual calendar time served, without consideration of good conduct time, equals one-half of the sentence or 30 calendar years, whichever is less, but in no event is the inmate eligible for release on parole in less than two calendar years").

24. Whitehead was dead when emergency personnel arrived at the scene at 6:55 a.m. Brosz died about twenty-four hours after she was taken to the hospital.

25. *Dewberry v. State,* 4 S.W.3d 735, 751 (Tex. Crim.App.1999).

worthiness of the statement.[26]

A number of factors are relevant to this inquiry: (1) whether the guilt of the declarant is inconsistent with the guilt of the defendant; (2) whether the declarant was so situated that he might have committed the crime; (3) the timing of the declaration; (4) the spontaneity of the declaration; (5) the relationship between the declarant and the party to whom the statement was made; and (6) the existence of independent corroborative facts.[27] The first two factors, as the Austin Court of Appeals has noted, logically apply only when the defendant is the proponent of the statement against interest that tends to exculpate the defendant.[28] When the statement is offered by the State to inculpate the defendant, as in the case before us, the first two factors are not relevant.

Rhodes spontaneously made the statements to Samuelson and Schwartz, his acquaintances from Insomnia who knew Whitehead but were not connected to the commission of the murders. He made the statement to Samuelson prior to the commission of the murders. He made the statement to Schwartz not long after the commission of the murders. These were "street corner" statements that Rhodes made to his friends without any motive to shift blame to another or minimize his own involvement in the murders. Thus, the timing and spontaneity of the statements tend to establish their reliability.

The State also presented evidence of independent corroborative facts that verified the reliability of Rhodes's statements to Samuelson and Schwartz. Samuelson testified that he received a denied credit card charge for admission to an anime festival in the mail, and that the charge was in Brosz's name. The murders took place on the night that Rhodes said he had a job for the appellant to do.

The physical evidence and the appellant's own admissions demonstrate that the appellant and Rhodes acted in concert throughout the commission of the offense. The testimony of Samuelson and Schwartz was admissible under Rule 803(24) because there were sufficient corroborating circumstances to indicate the trustworthiness of Rhodes's statements.

## B. Confrontation Clause

We next turn to the appellant's argument that the testimony of Samuelson and Schwartz was inadmissible under the Confrontation Clause. The threshold question is whether Rhodes's statements were testimonial or non-testimonial in nature.[29] Prior to the Supreme Court's decision in *Crawford*, hearsay statements were admissible for purposes of the Confrontation Clause if they possessed adequate "indicia of reliability." [30] The Supreme Court in *Crawford*, however, drew a distinction between testimonial and non-testimonial statements.[31] The Supreme Court declined to spell out a comprehensive definition of testimonial, but it stated that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." [32] The Supreme

26. *Ibid.* (citing *Davis v. State,* 872 S.W.2d 743, 749 (Tex.Crim.App.1994)).

27. *Davis,* 872 S.W.2d at 749.

28. *See Drone v. State,* 906 S.W.2d 608, 613 (Tex.App.-Austin 1995, pet. ref'd).

29. *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

30. *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

31. 124 S.Ct. at 1374.

32. *Ibid.*

Court held that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: Confrontation."[33]

Rhodes's statements to Samuelson and Schwartz do not fall within the categories of testimonial evidence described in *Crawford.* They were casual remarks that he spontaneously made to acquaintances.[34] Rhodes's statements were non-testimonial in nature; thus, the new rule articulated in *Crawford* is not applicable in this case. Points of error nine, ten, eleven, and twelve are overruled.

## IV. JURY CHARGE

■ In point of error thirteen, the appellant argues that the trial court erred by submitting part of the *Geesa* instruction in its charge to the jury during the guilt phase of the trial.[35] We held in *Geesa* that trial courts must define reasonable doubt in their jury charges and mandated the following six paragraph jury instruction:

[1] All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that a person has been arrested, confined, or indicted for, or otherwise charged with, the offense gives rise to no inference of guilt at his trial. The law does not require a defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit

the defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after a careful and impartial consideration of all the evidence in the case.

[2] The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense beyond a reasonable doubt, and if it fails to do so, you must acquit the defendant.

[3] It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all "reasonable doubt" concerning the defendant's guilt.

[4] A "reasonable doubt" is a doubt based on reason and common sense after a careful and impartial consideration of all the evidence in the case. It is the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs.

[5] Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

[6] In the event you have a reasonable doubt as to the defendant's guilt after considering all the evidence before you and these instructions, you will acquit him and say by your verdict "Not

33. *Ibid.*

34. *See Crawford,* 124 S.Ct. at 1364 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."); *see also United States v. Manfre,* 368 F.3d 832, 838 n. 1 (8th Cir.2004) (noting comments made to loved ones or acquaintances are not the kind of memorialized, judicial-process-created evidence of which *Crawford* speaks); *see also People v. Cervantes,* 118 Cal.App.4th 162, 174, 12 Cal.Rptr.3d 774 (App.2d Dist.2004) (holding that co-defendant's statement to a neighbor that he did not reasonably anticipate would be used at trial was non-testimonial in nature).

35. *Geesa v. State,* 820 S.W.2d 154 (Tex.Crim. App.1991).

guilty." [36]

In *Paulson v. State*, we overruled the portion of *Geesa* that required trial courts to instruct juries on the definition of reasonable doubt.[37] The appellant argues that the trial court's submission of a portion of the *Geesa* instruction was reversible error under *Paulson*. In this case, the trial court submitted paragraphs [1], [2], [3], and [6] of the *Geesa* instruction.[38] It did not submit paragraphs [4] and [5]. On appeal, the appellant challenges only the trial court's inclusion of paragraph [3]. He acknowledges that he did not object to the inclusion of paragraph [3] at trial, but argues that the alleged error caused him egregious harm, necessitating reversal under *Almanza v. State*.[39]

We held in *Paulson* that "the better practice is to give no definition of reasonable doubt at all to the jury."[40] We specifically criticized paragraphs [4] and [5] of the *Geesa* instruction as attempting to define reasonable doubt.[41] The instruction in the instant case did not contain these paragraphs. The trial court did not abuse its discretion by including paragraph [3] of the *Geesa* instruction in the jury charge at the guilt or innocence phase of the trial. Point of error thirteen is overruled.

In point of error fourteen, the appellant argues that the trial court erred by submitting a definition of reasonable doubt in its charge to the jury during the punishment phase. The appellant specifically complains about the following portions of the punishment charge:

It is not required that the State prove Special Issue No. 1 beyond all possible doubt; it is required that the State's proof excludes all reasonable doubt concerning the defendant.

* * *

It is not required that the State prove Special Issue No. 2 beyond all possible doubt; it is required that the State's proof excludes all reasonable doubt concerning the defendant.

The appellant again complains of the trial court's use of the language contained in paragraph [3] of the *Geesa* instruction. He again acknowledges that he did not object to the inclusion of this paragraph, but argues that the alleged error caused him egregious harm.[42] The appellant's argument fails for the same reasons expressed in point of error thirteen. Point of error fourteen is overruled.

## V. ADMISSIBILITY OF STATEMENT

■ In his sixth point of error, the appellant complains of erroneously admitted evidence during the punishment phase of his trial. He challenges the admission of the audio-taped statement that he gave to a California detective regarding his involvement in an uncharged offense. The statement pertained to the murder of Beau Sanders, the manager of Insomnia whose body was discovered in the desert area located southwest of Las Vegas, Nevada. The appellant asserts that the statement

36. *Ibid.*

37. 28 S.W.3d 570, 573 (Tex.Crim.App.2000).

38. The trial court submitted paragraphs [1], [2], [3], and [6] verbatim with one exception. The last line of paragraph [1] was shortened to read as follows: "The presumption of innocence alone is sufficient to acquit the defendant."

39. 686 S.W.2d 157 (Tex.Crim.App.1984).

40. *Id.*, at 573.

41. *Id.*, at 572.

42. *Almanza*, 686 S.W.2d at 171.

was inadmissible because it was not taken in compliance with the dictates of Texas Code of Criminal Procedure Article 38.22.

Article 38.22, Section 3(a)(2) provides that no oral statement of an accused made as a result of custodial interrogation shall be admissible against him in a criminal proceeding unless, prior to the statement but during the recording, he is given the warning in Section 2(a) and he knowingly, intelligently, and voluntarily waives the rights set out in the warning. The appellant must be warned of the following rights under Section 2(a):

> (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
>
> (2) any statement he makes may be used as evidence against him in court;
>
> (3) he has the right to have a lawyer present to advise him prior to and during any questioning;
>
> (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
>
> (5) he has the right to terminate the interview at any time.

Strict compliance with all portions of Section 3(a) is required.[43] The appellant specifically contends that his statement was inadmissible because the California detective failed to inform him that he had the right to terminate the interview at any time.

Detective Brad Toms of the San Bernardino County Sheriff's Department questioned the appellant at the Denton County Jail in January 2002.[44] The purpose of the interview was to find out information about the disappearance of Sanders, who had been missing since March 2001. Prior to taking the appellant's statement, Toms read him his rights from a card issued by the San Bernardino Sheriff's Department. He advised the appellant that he had the right to remain silent, that any statement he made could be used against him, that he had a right to a lawyer, and that if he was unable to employ a lawyer that one would be appointed for him. He did not advise the appellant that he had a right to terminate the interview at any time.

In his statement, the appellant told Toms that Sanders wanted to go to California and that Rhodes, Jeremy Stark, and Matthew Potts gave him a ride. The appellant knew that Rhodes and Stark actually planned to kill Sanders. The appellant was going to accompany them on the trip, but his girlfriend convinced him not to go. He lent them his car instead. He later learned that they shot and killed Sanders in the desert. Rhodes provided the guns and was present at the time of the murder, but only Stark and Potts shot Sanders. When they returned to Texas, they were in possession of Sanders's personal items, including clothing, a hat, compact discs, and a compact disc case, which they divided up among themselves. The appellant denied that he ordered a "hit" on Sanders. He said that Sanders was his friend and that he felt bad about what happened to him. He did not do anything to prevent the murder, and he did not go to the police because he was afraid of Rhodes and Stark.

 The appellant objected to the admission of the statement under Article 38.22. The trial court overruled the appellant's objection and admitted the state-

---

**43.** Tex.Code Crim. Proc. art. 38.22, § 3(e); *Nonn v. State,* 117 S.W.3d 874, 879 (Tex. Crim.App.2003); *Davidson v. State,* 25 S.W.3d 183, 185 (Tex.Crim.App.2000).

**44.** Detectives Smith, Garza, and Little were also present during the interview.

ment. The State concedes on appeal that the appellant's statement was not taken in compliance with the dictates of Article 38.22. The State argues that the appellant's statement was nevertheless admissible under Article 38.22, Section 3(c), which provides as follows:

> Subsection (a) of this section shall not apply to any statement which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted or stolen property or the instrument with which he states the offense was committed.

Under the exception set out in Section 3(c), oral statements asserting facts or circumstances establishing the guilt of the accused are admissible if, at the time they were made, they contained assertions unknown by law enforcement but later corroborated.[45] Such oral statements need only circumstantially demonstrate the defendant's guilt.[46] Furthermore, if such an oral statement contains even a single assertion of fact found to be true and conducive to establishing the defendant's guilt, then the statement is admissible in its entirety.[47]

The State asserts that the appellant's statement is admissible under the Section 3(c) exception because the police did not know where to find Sanders's body until the appellant told them. The State further asserts that the police did not know that Sanders was shot with Rhodes's .380 caliber pistol until the appellant gave his statement. The State's assertions, however, are not clearly supported by the record. During the interview, Toms told the appellant that Potts was already in custody in California for Sanders's murder and that they had a "nice long talk" with him

resulting in "thirteen pages of communication." Toms also stated that Potts told police exactly what happened and how it happened.

Toms described the search for and recovery of Sanders's body during his trial testimony:

Q. Okay. During the course of your investigation into the disappearance or missing Beau Sanders, did you ultimately end up going and searching a particular area of your county?

A. Yes sir, we did.

Q. What area was that?

A. It's a cement road. It's an area south of—or sorry, southwest of Las Vegas, approximately 45 minutes southwest of Las Vegas.

Q. And what is in this area? What kind of terrain is it?

A. Desert.

Q. Desert for as far as—

A. Open desert.

Q. So to search this type of area, what did ya'll do?

A. What we did was have search and rescue. We contacted volunteers and asked them to come out and conduct a grid search of a specific area that we had information that Beau Sanders'[s] body would be located in.

Q. How many times did you go and search this area, the desert area?

A. Two times.

Q. Were you successful or did you find anything the first time you went out there?

A. The first time we were not successful. We did not find anything at all.

---

**45.** *Moore v. State,* 999 S.W.2d 385, 400 (Tex. Crim.App.1999).

**46.** *Id.,* at 400–01.

**47.** *Id.,* at 401.

Q. Tell the jury what happened the second time.

A. I actually wasn't present during the search, but the second search, they went out and located evidence that would— that has now since been proven to be the body of Beau Sanders.

Q. What kind of evidence did the searchers find?

A. We found clothing, skeletal remains, and gun evidence, fired cartridge casings.

Q. What type of gun evidence did you find?

A. It was a .380 fired cartridge casing.

\* \* \*

Q. After the remains were found and identified, did you and your team come to Texas to talk to witnesses to investigate the matter?

A. Actually, I came to Texas prior to the remains being found.

\* \* \*

Q. And while you were here in Texas, did you have an opportunity to speak with Steven Michael Woods?

A. Yes sir, I did.

It is unclear from the record exactly what the police knew about Sanders's murder before they interviewed the appellant. Toms told the appellant during the interview that they had already talked to Potts and that he told them exactly what had happened and how it happened. It appears that the police had already searched the desert once based on information they received, presumably from Potts, about where Sanders's body was located. When Toms asked the appellant if he knew

where the murder took place, he said they "pulled off the road" in the "Mojave Reserve." We cannot discern from the record whether the appellant's description was any more detailed than the one that Potts may have given. Although Sanders's body was not found until after the appellant's statement, it appears that the police generally knew where to look for the body before the appellant's statement.

The State further notes in its brief on appeal that the appellant also told Detective Toms about the property from the crime scene taken by Rhodes, Stark, and Potts and that they had split up the property among themselves. The State concedes, however, that except for the fact that Mrs. Sanders, the victim's mother, identified a green bag that belonged to Beau in a photograph of items in the trunk of Marcus Rhodes's car, there is no indication in the record where and when the rest of the property was recovered.[48] Thus, even if the police did not know where to find Sanders's belongings until the appellant gave his statement, the record does not indicate whether the appellant's assertions were later corroborated.

■ The appellant's statement was not taken in strict compliance with Article 38.22 and the State has not clearly established an exception under Section 3(c). The trial court erred in admitting the statement. The erroneous admission of the appellant's statement amounts to nonconstitutional error.[49] The appropriate standard of harm is to disregard the error unless a substantial right has been affected.[50] A substantial right is affected when the error has a substantial and injurious effect or influence in determining the

48. Citation omitted.

49. *Nonn,* 117 S.W.3d at 881.

50. Tex. R App. P. 44.2(b).

jury's verdict.[51]

Other witnesses testified that the appellant was more involved in Sanders's murder than he told Toms in his statement. Michael Cavin testified that he and the appellant were staying at the apartment of a mutual friend in March 2001. Cavin observed the appellant, Stark, Rhodes, and Potts planning Sanders's murder at that time. The appellant told Cavin that he was taking Sanders out to California to kill him and that he would kill Cavin if he told anybody. Cavin was at Insomnia with the group on the night they were going to leave for California. Rhodes, Stark, Potts, and Sanders left in the appellant's car and the appellant stayed behind in Dallas. A day or two later, the appellant woke Cavin at 3:00 a.m., pointed a 12–gauge shotgun in his face, and asked him if he was still going to tell anybody. After the murder, the appellant, Rhodes, Stark, and Potts divided up Sanders's personal items amongst themselves.

In addition, Stephen Price testified that he encountered the appellant when the appellant was in hiding in California after he committed the murders of Whitehead and Brosz. The appellant told Price that he murdered Whitehead because he "was a threat to go to the police" about the murder of Sanders that Rhodes and "two other people" committed in California.

The testimony of Cavin and Price was stronger evidence of future dangerousness than the appellant's statement. In his statement, the appellant alleged only minimal participation and showed some remorse about Sanders's death. According to Cavin and Price, however, the appellant plotted Sanders's death and killed Whitehead in order to prevent him from telling the police what he knew about Sanders's murder.

And the appellant's involvement in Sanders's murder was not the only evidence of future dangerousness. The evidence showed that, in the weeks leading up to the murders of Whitehead and Brosz, the appellant planned to steal money from a clothing store and to kill a woman named Deborah Handley during a drug transaction. The appellant also got into a fight with another inmate while incarcerated in the Denton County Jail awaiting trial. As a juvenile, he made a homemade bomb and committed the offense of "criminal sexual conduct." Finally, the State introduced a recorded telephone call that the appellant made the night before the punishment phase in his capital trial began. The appellant tried to call Detective Toms, who was out of the office, and instead spoke to Detective Boldt and offered to give more information about to Sanders's murder. The State argued during closing that this phone call was evidence that the appellant was "still trying to manipulate people" and that he knew he was "going down" so he was "going to try to take the rest of his group with him." Given all of this evidence, coupled with the violent and premeditated murders of Whitehead and Brosz, it is unlikely that the appellant's statement had a substantial and injurious effect on the jury's verdict at punishment.[52] Point of error six is overruled.

## VI. TEXAS DEATH–PENALTY STATUTE

The appellant argues his first three points of error together. In his first point of error, he asserts that the Texas death-penalty statute is unconstitutional because it places the burden of proving the mitiga-

51. *Nonn,* 117 S.W.3d at 881.

52. *Nonn,* 117 S.W.3d at 881.

tion special issue on the appellant. In his second point of error, he contends that the trial court erroneously overruled his motion to hold the Texas death-penalty statute unconstitutional on this basis. In his third point of error, he argues that the trial court should have instructed the jury that the State was required to prove beyond a reasonable doubt that the mitigation issue should be answered in the negative. The appellant relies on *Apprendi v. New Jersey*,[53] and *Ring v. Arizona*[54] to support his claims. We have previously rejected such arguments.[55]

In his post-submission brief,[56] the appellant argues that *Blakely v. Washington*[57] supports his claims and is contrary to our cases interpreting *Apprendi* and *Ring*. In *Apprendi*, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[58] In *Blakely*, the Supreme Court defined the term *statutory maximum* for purposes of an *Apprendi* analysis. It held that the statutory maximum

is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose

after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.[59]

The appellant argues that this language in *Blakely* means that the State must prove a negative answer to the mitigation special issue beyond a reasonable doubt in order for the trial judge to impose a sentence of death. More specifically, he argues that after a jury finds a defendant guilty of capital murder and answers the future dangerousness special issue "yes," the maximum sentence that can be imposed is a life sentence. Then he argues that the only way death can be imposed is after an additional finding: The jury must answer "no" to the mitigation special issue. As a result, he claims that the statutory maximum, in the absence of the negative mitigation finding, is life imprisonment.

We disagree with the appellant's conclusion. In *Resendiz*, we rejected the argument that the State bears the burden of proving a negative answer to the mitigation special issue.[60] We reached this conclusion, in that case, because the statutory maximum for capital murder is fixed at death.[61] *Blakely* does not affect this holding.

---

53. 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

54. 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

55. *Bell v. State*, 938 S.W.2d 35, 54 (Tex.Crim. App.1996); *Moore v. State*, 935 S.W.2d 124, 126–28 (Tex.Crim.App.1996).

56. Oral argument in this case was heard on June 23, 2004. The United States Supreme Court delivered *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403

(2004), on which the appellant's post-submission brief relies, on June 24, 2004.

57. *Ibid.*

58. *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348.

59. *Blakely*, 124 S.Ct. at 2537 (citations omitted).

60. *Resendiz*, 112 S.W.3d at 550.

61. *Ibid.*

In *Blakely, Ring,* and *Apprendi,* a trial judge made findings that increased the defendants' sentences beyond the statutory maximum. The Supreme Court held in these cases that a finding, other than a prior conviction, that increases the defendant's sentence beyond the maximum statutory punishment must be found by a jury beyond a reasonable doubt. Article 37.071 satisfies these requirements.

 Under Article 37.071, the jury makes the findings. The future dangerousness special issue [62] and the parties special issue,[63] when it applies, must be proven by the State beyond a reasonable doubt.[64] The mitigation special issue [65] has the potential to reduce the appellant's sentence, not increase it. As a result, the State need not prove a negative answer beyond a reasonable doubt. Points of error one, two, and three are overruled.

In his fourth point of error, the appellant attacks the Texas death-penalty statute on the grounds that the mitigation special issue gives the jury unfettered discretion and permits the arbitrary and capricious imposition of the death penalty. We have previously rejected such arguments.[66] Point of error four is overruled.

 In his fifth point of error, the appellant complains that the Texas death-penalty statute is unconstitutional because the mitigation instruction sends the same "mixed signals" to jurors as the court-made nullification instruction given to the jury in *Penry v. Johnson (Penry II ).*[67] He asserts that the statutory mitigation instruction sends mixed signals because it is unclear as to the burden of proof.

In *Hall v. State,*[68] we held that the mitigation instruction contained in the Texas death-penalty statute is a statutory codification of the dictates handed down by the United States Supreme Court in *Penry v. Lynaugh (Penry I ).*[69] We have previously upheld the constitutionality of this provision.[70] The Supreme Court also commented on the difference between the statutory mitigation instruction and the court-made nullification instruction in *Penry II:*

---

**62.** The future dangerousness special issue asks the jury to decide "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex.Code Crim. Proc. art. 37.071, § 2(b)(1).

**63.** The parties special issue asks the jury to decide "in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken." *Id.,* at art. 37.071, § 2(b)(2).

**64.** *Id.,* at art. 37.071, § 2(c).

**65.** The mitigation special issue asks the jury to decide "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." *Id.,* at art. 37.071, § 2(e)(1).

**66.** *Bell v. State,* 938 S.W.2d 35, 54 (Tex.Crim. App.1996); *Moore v. State,* 935 S.W.2d 124, 126–28 (Tex.Crim.App.1996).

**67.** 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001).

**68.** 67 S.W.3d 870, 877 (Tex.Crim.App.2002).

**69.** 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

**70.** *Jones v. State,* 119 S.W.3d 766, 790 (Tex. Crim.App.2003), *cert. denied,* — U.S. ——, 124 S.Ct. 2836, 159 L.Ed.2d 270 (2004); *Shannon v. State,* 942 S.W.2d 591, 598 (Tex. Crim.App.1996).

A clearly drafted catchall instruction on mitigating evidence also might have complied with *Penry I.* Texas' current capital sentencing scheme ·(revised after Penry's second trial and sentencing) provides a helpful frame of reference ... Penry's counsel, while not conceding the issue, admitted that he "would have a tough time saying that [*Penry I*] was not complied with under the new Texas procedure." (citation omitted). At the very least, the brevity and clarity of this instruction highlight the confusing nature of the supplemental instruction actually given, and indicate that the trial court had adequate alternatives available to it as it drafted the instructions for Penry's trial.[71]

The appellant has not convinced us that the statutory mitigation instruction in its present form is unconstitutional.[72] Point of error five is overruled.

We affirm the judgment of the trial court.

WOMACK, J., filed a dissenting opinion.

WOMACK, J., dissenting.

I do not agree with the court's decision that the error of admitting the appellant's confession to committing the murder of Beau Sanders was harmless.

The court says it is unlikely that the erroneously admitted confession had a substantial and injurious effect on the punishment verdict. *Ante,* at 120.

The punishment stage of a capital trial will happen after a defendant has been found guilty of committing a capital crime. The question for the jury is whether to find, beyond a reasonable doubt, that the defendant probably will commit more criminal acts of violence that will constitute a danger to society. A defendant's confession that he already has committed a second murder is a very powerful piece of evidence. I could not find it unlikely that the erroneous admission of such evidence had no substantial effect on the jury's decision.

The court says, first, that Michael Cavin and Stephen Price testified that the appellant was involved in the murder of Sanders, and that he was involved to a greater degree than he confessed. *Id.,* at 119. But this ignores the difference between a confession and the testimony of those individuals. A confession is a statement against penal interest, and it is viewed as reliable. The testimony of Cavin and Price, without the confession, would have carried less weight.

The court says that there was other evidence at the punishment stage. The appellant "planned" to commit two other crimes: stealing money from a clothing store and killing a woman during a drug transaction. *Id.,* at 119. But plans are not deeds.

The court adds to the list of evidence the appellant's offer to give the police more information about Sanders's murder. The court seems to accept the State's argument that this was evidence of bad character. Until now, I had thought it would be recognized by every law-abiding person, to say nothing of a prosecutor and a court, that helping the investigation of a murder was a good thing and that "omerta" was the ethic of organized crime.

I would reverse the sentence of death and remand the case for another hearing on punishment.

---

**71.** 121 S.Ct. at 1923–24.

**72.** *Jones,* 119 S.W.3d at 790.