IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,287






EX PARTE STEVEN MICHAEL WOODS








ON APPLICATION FOR WRIT OF HABEAS CORPUS


CAUSE NO. F-2002-0541-E IN THE 367TH DISTRICT COURT

DENTON COUNTY




 Cochran, J., delivered the opinion of the Court in which Keller, P.J., Meyers,
Price, Johnson, Keasler, Hervey and Holcomb, JJ., joined. Womack, J., concurs in the
denial of relief.


OPINION


 This is an application for writ of habeas corpus filed pursuant to Article 11.071 of the
Texas Code of Criminal Procedure. 

 On August 21, 2002, applicant was convicted of capital murder. The jury answered
the special issues submitted pursuant to Article 37.071, and the trial court, accordingly, set
punishment at death. This Court affirmed applicant's conviction and sentence on direct
appeal. Woods v. State, 152 S.W.3d 105 (Tex. Crim. App. 2004).

 Applicant presents fifteen allegations in his application in which he challenges the
validity of his conviction and resulting sentence. The trial court did not hold an evidentiary
hearing. The trial court entered findings of fact and conclusions of law and recommended
that the relief sought be denied. We adopt the trial court's comprehensive findings of facts
and conclusions of law and, based upon those findings and our own independent review, we
deny relief. 

 We need address only why applicant's first claim-that of ineffective assistance of
counsel during the punishment phase of his trial-is without merit when gauged by the
standards set out in Strickland v. Washington, (1) and refined by Wiggins v. Smith. (2)

 In his application for writ of habeas corpus, applicant repeatedly cites to Wiggins v.
Smith, arguing that, much like the attorneys in Wiggins, applicant's trial counsel failed to
properly investigate his background and failed to present available mitigating evidence. 
While there are some similarities between applicant's claim and that found in Wiggins, their 
differences predominate. 

 Kevin Wiggins was convicted of first degree murder, robbery, and theft by a Maryland
judge, and he then elected to be sentenced by a jury. (3) During opening arguments of his
sentencing hearing, Wiggins's attorneys promised to present evidence of their client's
"difficult life." (4) However, during that hearing, they presented no evidence concerning his
alcoholic mother, sexually abusive foster parents, or any other mitigating circumstances. (5) 
Instead, they focused wholly on "'retrying the factual case' and disputing Wiggins's direct
responsibility for the murder." (6) The Supreme Court found their performance to be deficient,
not because they failed to present the mitigating evidence that they had promised, but
because they failed to investigate mitigating factors. (7) 

 While Strickland does not require defense counsel to investigate each and every
potential lead, or present any mitigating evidence at all, it does require attorneys to put forth
enough investigative efforts to base their decision not to present a mitigating case on a
thorough understanding of the available evidence. (8) Because the attorneys in Wiggins did not
conduct an adequate investigation, they could not have made "a fully informed decision with
respect to sentencing strategy." (9) Thus, they failed to provide objectively reasonable
assistance of counsel under the first prong of the Strickland standard. (10)

 However, in the present case, applicant's attorneys did investigate their client's
background, and did present mitigating evidence, albeit only a minimal amount. During their
investigation, they spoke with applicant's family members, tracked down medical,
psychological and school records, used expert witnesses, and extensively interviewed
applicant himself regarding potential mitigating evidence.

 Applicant's counsel hired three separate mitigation specialists to interview applicant
and testify on his behalf. One of the three experts performed so poorly that the attorneys
dismissed her early in their trial preparation. The second expert, Dr. Kelly Goodness,
interviewed applicant extensively, and fully reviewed his social and medical history. Based
on her findings, Dr. Goodness was unwilling to state under oath that applicant would not
pose a threat of future dangerousness, and she believed that no other objective expert would
be able to reach a different conclusion based upon personal interaction with applicant. 

 Armed with this expert's opinion and her extensive information about their client's
background and personality, applicant's attorneys took Dr. Goodness's advice to hire a third
expert, Dr. Robin Neeley, to review applicant's records without conducting any face-to-face
interviews. They hoped Dr. Neeley could give a "more objective, clinical-type opinion for
mitigation," without being subject to cross-examination on her personal knowledge of
applicant's previous "inappropriate" social behavior. Dr. Neeley testified during the
sentencing hearing about applicant's drug addiction, self-injurious and suicidal behavior,
abusive and alcoholic father, neglectful mother, and institutionalization for mental and drug-related problems. In fact, much of the mitigating evidence applicant now claims his attorneys
should have presented through his friends and family was presented by Dr. Neeley. While
applicant argues that this evidence would have been more favorable and personal if it had
come directly from those who knew him best, his attorneys had good reasons for not calling
these witnesses to testify at trial. They did not want the jury to "know" applicant.

 Applicant's mother was willing to testify, but she was unwilling to admit that her
son's failings had anything to do with his upbringing because she felt that she was a good
mother who did the best she could with an out-of-control child. Before trial, applicant's
father repeatedly refused to testify on his son's behalf under any circumstances. While other
witnesses may have been willing to testify on applicant's behalf, they would have been
subject to cross-examination regarding their knowledge of applicant's involvement in
Satanism, his proclivity for making and using pipe bombs, and his abusive behavior towards
other people as well as animals. It was not a deficient strategy for applicant's attorneys to
decline to call witnesses who would testify to some mitigating facts, but then be subject to
cross-examination concerning a vast array of aggravating facts.

 Further, the State informed applicant's attorneys that it had substantial rebuttal
evidence ready if applicant sponsored such witnesses. This included evidence that applicant: 


 sexually abused both his younger brother and a former girlfriend; 
 made bombs in his home; 
 physically abused his siblings; 
 physically abused his dogs; 
 attempted to burn down his school; 
 physically threatened his teachers; 
 actively participated in Nazi and skinhead groups; 
 dealt drugs; and 
 regularly carried a gun. 


Applicant's stepfather, fiancée, and his fiancée's family were all willing to testify for the
State regarding applicant's anti-social, sadistic behavior and bad character. 

 Applicant himself refused to give his own attorneys details of his "troubled" past. He
consistently minimized the impact of-or denied the existence of-most of the mitigating
evidence his attorneys were able to find. While applicant certainly would have been able to
testify regarding his deeply "troubled" past, he was unwilling to admit that his childhood was
anything other than that of the average person. Based on applicant's unwillingness to openly
discuss mitigating evidence, and the other extraordinarily damaging information his attorneys
learned of during their investigation, they determined that the best sentencing strategy would
be to present only the clinical, objective opinion of an expert witness.

 Applicant's trial attorneys did not interview each and every potential witness now
suggested by applicant in his habeas application, and therefore they did not conduct the most
thorough investigation possible. Other attorneys might have interviewed more potential
witnesses or used a different strategy at sentencing. However, unlike the attorneys in
Wiggins, ample evidence shows that their decision not to pursue such avenues was based on
"reasonable professional judgments [supporting] the limitations on investigation." (11) When
an attorney opens Pandora's box, he is not constitutionally required to examine each and
every disease, sorrow, vice, and crime contained therein before quietly and firmly closing the
cover.

 It is entirely reasonable to conclude that a Texas jury would be singularly unimpressed
by the sordid details of applicant's background and bad character traits. Reasonable
judgment in determining a sentencing strategy is sufficient under the standard set forth by
the Supreme Court in Strickland and refined in Wiggins. Because applicant has failed to
prove that his attorneys did not meet this standard, we conclude that applicant's ineffective
assistance of counsel claim is without merit under federal constitutional standards. 


Cochran, J.

Delivered: November 2, 2005

Publish 
1. 466 U.S. 668 (1984).
2. 539 U.S. 510 (2003); see also Rompilla v. Beard, ___ U.S. ___, 125 S.Ct. 2456 (2005).
3. Id. at 515.
4. Id.
5. Id. at 515-17.
6. Id. at 517.
7. Id. at 522-34. The Supreme Court found the failure to investigate was unreasonable
because the attorneys had access to information in the Department of Social Services report and
the presentence investigation which would have led a reasonable attorney to further investigate
Wiggins's family and social history.
8. Id. at 533. Strickland sets out a two prong test for determining whether trial counsel was
constitutionally ineffective. A defendant must first prove that his trial counsel's performance fell
below an objective standard of reasonableness. If this prong is met, the defendant must then
show that but for the ineffective assistance, a reasonable probability exists that the outcome of
the trial would have been different. Strickland, 466 U.S. at 687.
9. Wiggins, 539 U.S. at 528.
10. Id. at 533. The Supreme Court noted that Wiggins "has the kind of troubled history we
have declared relevant to assessing a defendant's moral culpability." The Court went on to find
"that had the jury been confronted with this considerable mitigating evidence, there is a
reasonable probability that it would have returned with a different sentence." Id. at 535-36.
11. Id. at 533 (quoting Strickland, 466 U.S. at 690-91).