**Rodney L. RICH, Appellant,**

v.

**The STATE of Texas, State.**

No. 2–01–102–CR.

Court of Appeals of Texas,
Fort Worth.

Dec. 1, 2005.

Robert Ford, Whitney S. Wiedeman, Fort Worth, for appellant.

Tim Curry, Criminal Dist. Atty., Charles M. Mallin, Asst. Criminal Dist. Atty. and Chief of the Appellate Section, Danielle A. Legault, Timothy Bednarz, Tiffany Hamilton, Asst. Criminal Dist. Attys., Fort Worth, for appellee.

PANEL A: CAYCE, C.J.; LIVINGSTON and WALKER, JJ.

### OPINION ON REMAND

JOHN CAYCE, Chief Justice.

#### I. Introduction

Rodney L. Rich appeals from his convictions for burglary of a habitation and aggravated assault with a deadly weapon. Appellant complains that the trial court erred by preventing him from asking venire members during voir dire about their views on what constitutes reasonable doubt. The State concedes that appellant was entitled to question prospective jurors about their concepts of reasonable doubt but asserts that the trial court's error in limiting the voir dire was harmless. Because we agree that the error was harmless, we affirm.

#### II. Procedural History

In our original opinion, we concluded that the error was harmless under appellate rule 44.2(b) after applying the test for individual voir dire examinations set out in *Anson v. State.*[1] The court of criminal appeals granted appellant's petition for discretionary review and held that the *Anson* test is inapplicable to cases in which voir dire is conducted in a group setting rather than individually.[2] Instead, the

---

1. *See Rich v. State,* 114 S.W.3d 54, 57 (Tex. App.-Fort Worth 2003) (citing *Anson,* 959 S.W.2d 203, 204 (Tex.Crim.App.1997), *cert.* *dism'd,* 525 U.S. 924, 119 S.Ct. 290, 142 L.Ed.2d 241 (1998)).

2. *Rich v. State,* 160 S.W.3d 575, 577 (Tex. Crim.App.2005).

court of criminal appeals held that we should have conducted our harm analysis in light of the factors applicable to cases involving the erroneous admission of evidence.[3]

■ The court of criminal appeals then remanded the case to this court for a rule 44.2(b) harm analysis based on those factors, which include: (1) voir dire, (2) the jury instructions, (3) the character of the alleged error and how it might be considered in connection with other evidence in the case, (4) any testimony or physical evidence admitted for the jury's consideration, (5) the nature of the evidence supporting the verdict, (6) the State's theory and any defensive theories, (7) closing arguments, and (8) whether the State emphasized the error.[4] After conducting this review, we again conclude that the trial court's error in limiting appellant's voir dire was harmless.

### III. Analysis

■ **Voir Dire.** During voir dire, the trial court refused to allow defense counsel to ask the venire members, "What does 'reasonable doubt' mean to you?" Although this limitation on voir dire was improper,[5] the State repeatedly emphasized to the venire members that the State had the burden of proving beyond a reasonable doubt that appellant had committed the charged offenses. The prosecutor explained:

> The burden of proof as you probably heard, ... the burden of proof is beyond a reasonable doubt.... [A]s district attorneys [we] have to prove the charges to you beyond a reasonable doubt.

The burden of proof is always on us. It never shifts to the defense. They're not required to bring forward any witnesses or evidence. They certainly can if they want to, but they're not required to. So the burden of proof is always on us, and we have to prove the case beyond a reasonable doubt.

Likewise, defense counsel emphasized the State's duty to prove its case beyond a reasonable doubt, the prosecutor's duty "to do justice," and defense counsel's duty "to zealously represent my client."

> And the reason the law is set up that way, out of that conflict, out of the prosecutor attempting to do justice, bringing the evidence, trying to prove the case to you beyond a reasonable doubt, and myself zealously representing my client, putting the prosecution to the test, making them prove their case beyond a reasonable doubt, out of that conflict is supposed to come the truth.

> That's what we're here for. We're here today to find out or being to find out what the truth is in this particular case and what really happened on the day in question....

The trial court also orally instructed the venire members: "You will not be getting any instructions from me as far as specifically what reasonable doubt is. You will be given an instruction as to how you are to consider."

**Jury Instructions.** Later, in the court's charge, the trial court instructed the jury as follows: "It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's

---

3. *Id.* at 577–78.

4. *Id.; see also Sanchez v. State,* 165 S.W.3d 707, 713 n. 16 (Tex.Crim.App.2005) (citing its opinion in *Rich* and stating that rule 44.2(b) "is applicable when voir dire is conducted in

a group setting and defendant is prohibited from asking a proper question of the panel").

5. *See Barajas v. State,* 93 S.W.3d 36, 38 (Tex. Crim.App.2002); *Woolridge v. State,* 827 S.W.2d 900, 906 (Tex.Crim.App.1992).

proof excludes all reasonable doubt concerning the defendant's guilt." The court of criminal appeals has held that this instruction is proper.[6]

**█ Character of the Error and How it Might be Considered in Connection With the Evidence in the Case.** A defendant is entitled to question venire members to determine how they would apply the State's burden of proof because such examination seeks to discover a prospective juror's views on an issue applicable to the case.[7] A trial court abuses its discretion when it denies defense counsel the right to ask prospective jurors a proper question because it prevents the defendant from intelligently exercising his peremptory strikes.[8]

In this case, appellant was prevented from peremptorily striking venire members based on their individual views of what constitutes reasonable doubt. The venire members were, however, properly instructed several times that the State was required to prove appellant's guilt beyond a reasonable doubt, and neither the Constitution nor any Texas statute requires that a particular form of words be used in advising the jury what reasonable doubt means—or that reasonable doubt be defined at all.[9] There is no evidence that anyone who sat on the jury was unwilling or unable to follow the reasonable doubt instruction. Further, as we discuss below, the evidence of appellant's guilt is overwhelming.

**Nature of Evidence Supporting Verdict, Including Testimony and Physical Evidence.** The events giving rise to the charged offenses occurred during the early morning hours of October 29, 2000. Appellant affirmatively states that he "does not challenge the sufficiency of the evidence" to support his convictions.[10]

Regarding the aggravated assault charge, although appellant requested and received a jury instruction on self-defense, he testified on his own behalf at guilt-innocence and admitted that he had stabbed the victim, Shauna Bess. Appellant and Bess, the mother of appellant's four children, gave conflicting testimony regarding who was the initial aggressor. Bess testified that appellant had attacked her with a kitchen knife; appellant testified that Bess had initially come after him

---

**6.** *Woods v. State,* 152 S.W.3d 105, 115 (Tex. Crim.App.2004), *cert. denied,* — U.S. —, 125 S.Ct. 2295, 161 L.Ed.2d 1092 (2005).

**7.** *Barajas,* 93 S.W.3d at 38; *Woolridge,* 827 S.W.2d at 906.

**8.** *Barajas,* 93 S.W.3d at 38; *Woolridge,* 827 S.W.2d at 906–07; *Smith v. State,* 703 S.W.2d 641, 643 (Tex.Crim.App.1985).

**9.** *See Paulson v. State,* 28 S.W.3d 570, 573 (Tex.Crim.App.2000); *see also Hankins v. State,* 132 S.W.3d 380, 384 (Tex.Crim.App.) (holding that, because *Geesa* instruction defining reasonable doubt is no longer required, trial court did not abuse its discretion in refusing appellant's request to ask venire members whether they could consider and follow it), *cert. denied,* 543 U.S. 944, 125 S.Ct. 358, 160 L.Ed.2d 256 (2004).

**10.** The burglary count of the indictment alleged that appellant

> did intentionally or knowingly, without the effective consent of Shauna Bess, the owner thereof, enter a habitation with intent to commit aggravated assault [and did attempt to commit or commit aggravated assault] and the defendant did use or exhibit a deadly weapon, to-wit: a knife, that in the manner of its use or intended use was capable of causing death or serious bodily injury.

The aggravated assault count of the indictment alleged that appellant

> did intentionally or knowingly cause bodily injury to Shauna Bess by stabbing her with a knife and the defendant did use or exhibit a deadly weapon, to-wit: a knife, that in the manner of its use or intended use was capable of causing death or serious bodily injury.

with the knife and cut his hand, but he had wrestled it away from her.

Regardless of how the altercation began, however, appellant admitted that he had stabbed Bess five or six times after disarming her—out of anger, not in self-defense. Appellant testified that he was angry over "[e]verything she had done to me"—the couple's stormy romantic relationship and Bess's alleged cutting of his hand with the knife before he took it from her. Appellant further testified that, after stabbing Bess, he had gone outside and slashed her car tires because "I was mad." In addition, he acknowledged that Bess had been terrified of him at the time.

With regard to the burglary charge, Bess testified that she and appellant were not living together at the time of the offense. Appellant did not have a key to her home, because she had made him return his keys when he moved out in September 2000 and then had the locks changed. In the early morning hours before the assault, appellant's mother called and said that appellant was intoxicated and was probably on his way over to Bess's home. When he arrived at Bess's home, appellant ran into her car, which was parked in the driveway, and then walked to the front door. When Bess would not let him inside, appellant kicked open the door, splintering the jamb, and went inside. About an hour later, after Bess had attempted to calm

appellant down by talking to him, the assault occurred.

Officer Richard Devoe testified that he had conducted a crime scene investigation at Bess's residence immediately after the alleged offenses had occurred. Officer Devoe testified that he had "found some evidence . . . from the front door where it had been broken." This evidence consisted of what appeared to be a heel print on the door's exterior near the door knob, a broken piece of the door jamb that had been partially torn loose but was still connected to the door frame, a broken piece of the door jamb that was lying on the porch just in front of the front door, and the striker plate for the door knob—with the screws still in it—that was lying on the driveway fourteen inches to two feet from the front door.

Officer Devoe testified that he photographed this damage, as well as the damage appellant caused by running into Bess's car and slashing her tires. The photographs were admitted into evidence and published to the jury. Officer Devoe also picked up the broken piece of the door jamb and the striker plate and placed them into an evidence bag.

Appellant testified inconsistently about whether he had a key to Bess's home at the time of the October 29 incidents, and there is evidence that Bess did not always keep her door locked.[11] Initially, appellant

---

11. Appellant's ten-year-old sister Candace, who often visited Bess, testified that appellant had taken her to Bess's home on the afternoon before the assault occurred. Candace testified that Bess was not home when they arrived, but the door was unlocked, so Candace and appellant went inside. Bess confirmed that she had returned home to find Candace in her house and that Candace had said she got in because the door was open. Bess testified that she had thought the door was locked when she left but that her brother Randy, who was living with her, must have forgotten to lock it. Doris Rich, appellant's mother, also testified that she and appellant had dropped Candace off at Bess's house and that the door had been closed but unlocked.

None of this evidence, however, is inconsistent with Bess's testimony that she would not let appellant into her home just before the assault occurred. Moreover, Doris confirmed that she had called Bess in the wee hours of the morning on October 29 to say that appellant was drunk and probably on his way to Bess's home. Doris testified that she assumed he was headed there because appellant

testified that he had returned his key to Bess when he moved out of Bess's home in September 2000. Later, however, he testified that he had a key on October 29 because, after Bess had changed the locks in September, she had given him a key to the new lock. He further testified that, although he was living with his mother at the time, he had spent the night at Bess's home a week or two before October 29.

Appellant also testified inconsistently concerning whether he had kicked in Bess's front door on October 29. Appellant admitted running into Bess's car in her driveway before the assault and slashing her tires afterwards, but he initially denied kicking in the door. Instead, he testified that any damage to Bess's door had occurred two months earlier, in August 2000, when he had kicked the door in because it was locked and Bess would not let him inside.[12] According to appellant, on October 29 Bess had come out of the house while he was still in the driveway, asked why he had run into her car, and then allowed him to enter her home.

On cross-examination, however, appellant testified that he did not recall whether he had kicked in the door before the assault and that he did not recall making the heel print on the door. He also testified that there "[c]ould be a possibility" that he had kicked in the door when he entered Bess's home the second time—post-assault after slashing her tires—to get his eldest son.

**Closing Arguments.** During closing arguments, the defense argued that the State had not proven the charged offenses beyond a reasonable doubt. In response, the State directed the jury's attention to Bess's testimony, appellant's admission that he had stabbed Bess several times and had done it out of anger rather than fear, all the physical evidence that appellant had kicked Bess's door in on October 29, and appellant's equivocating testimony concerning whether, or when, he had done so.

## IV. Conclusion

In summary, our review of the record shows that, although the trial court improperly limited appellant's voir dire, the jury was instructed repeatedly that the State had to prove the charged offenses beyond a reasonable doubt. Although the trial court did not give the jury any instructions regarding the definition of reasonable doubt—except that it does not mean beyond all possible doubt—the court of criminal appeals has held that the better practice is not to define reasonable doubt for the jury.[13] Further, there is no evidence that anyone who sat on the jury would have been unable or unwilling to follow the court's reasonable doubt instruction. Finally, appellant has affirmatively stated on appeal that he does not challenge the sufficiency of the evidence to support his convictions, and there is overwhelming evidence that appellant did, indeed, commit those offenses.

For all of these reasons, we hold that the trial court's improper limiting of appellant's voir dire regarding the venire members' concepts of reasonable doubt did not, under the circumstances of this case, affect

and Doris sometimes spent the night at Bess's house after they had been out late drinking.

12. Appellant and Bess were still living together at that time. Bess also testified that appellant had kicked in the door, causing damage to the trim, in August 2000. She further testified, however, that appellant had re-

placed the damaged trim and that, except for a crack in the wall, the damage depicted in Officer Devoe's photographs was done on October 29.

13. *See Paulson,* 28 S.W.3d at 573.

appellant's substantial rights.[14] Accordingly, we disregard the error and overrule appellant's issue.[15]

Having overruled appellant's issue, we affirm the trial court's judgments.

14.  *See* Tex.R.App. P. 44.2(b).

15.  *See id.*