IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO. PD-0548-05






DAVID WAYNE CASEY, JR., Appellant



v.



THE STATE OF TEXAS, Appellee





ON THE STATE OF TEXAS' PETITION FOR DISCRETIONARY REVIEW


FROM THE THIRD COURT OF APPEALS


DALLAS COUNTY





 Holcomb, J., delivered the opinion of the Court, in which, Keller, P.J., Meyers,
Womack, Johnson, Keasler, Hervey, and Cochran, JJ., joined. Price, J., dissented.


O P I N I O N 



 Appellant David Wayne Casey was charged with aggravated sexual assault under Texas
Penal Code § 22.021(a)(1)(A)(i), (2)(A)(vi) (Vernon Supp. 2006). He was tried before a jury
and convicted of the lesser offense of sexual assault. The Third Court of Appeals reversed
appellant's conviction, holding that twenty-four photographs admitted over objection were
offered merely to show appellant's propensity to commit crimes and were unfairly prejudicial. 
Casey v. State, 160 S.W.3d 218, 226-28 (Tex. App.--Austin 2005) (citing Tex. R. Evid. 401,
404 & 403). In a second issue, the court of appeals concluded that the use of the word
"victim" in the jury charge was "clearly calculated to injure appellant's rights and was therefore
harmful." Id. at 230 (citing Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)
(op. on reh'g)). We reverse the judgment of the court of appeals. 

I.

Relevant Facts

 Appellant and one of his friends, Scott Cannon, were tried jointly for drugging and
sexually assaulting K.T., the complainant. Cannon was acquitted, appellant was convicted, and
the jury sentenced him to a twenty-year prison term.

 K.T. met appellant at a party a couple of months prior to the offense. Chris Nunn, K.T.'s
then-boyfriend and appellant's friend, introduced K.T. to appellant at the party. By the time of
the offense, K.T. was no longer dating Nunn.

 On the night of the offense, K.T. was working as a waitress at topless bar. (1) She called
appellant on her cell phone to see what he was doing. K.T. got another call and told appellant
that she would call him back, but appellant and Cannon arrived at the bar a short time later to
see K.T. K.T. then conversed with appellant and Cannon and had at least one drink with them.
 (2) Appellant and Cannon invited K.T. to appellant's house "to hang out," and she accepted. 

 K.T. followed Cannon and appellant to his house in her own car. After arriving at
appellant's house, the three were joined by appellant's roommate, Jessie Diaz, and his female
companion, Brandy. Appellant, Diaz, and Cannon went into the kitchen and prepared some
vodka "shots" for everyone. When the men returned to the living room, the shots were passed
around to everyone; Diaz handed K.T. a shot. K.T. testified that she drank only part of the shot
because she did not like the taste and she generally did not drink much. However, K.T. was
encouraged (3) to drink the rest of it, and she did. 

 K.T. testified that she felt extremely intoxicated about one minute after drinking the
vodka shot and lost consciousness, although she had brief intervals of partial lucidity
throughout the rest of the evening. K.T. described these intervals as follows: "[I felt] weak and
nauseous mostly, most of all nauseous. And I mean I could see, but it was just like I would see
double. Like I would see for a second then I would see it double, and then I would throw up and
then I would pass back out." K.T. further testified that these moments of partial coherence
lasted approximately a minute or less. 

 K.T. remembered first being dragged from the living room and into a hallway. At this
point, she realized her shirt had been removed and she was vomiting and defecating. She saw
appellant and Cannon standing over her discussing what to do with her. While in the hallway,
she perceived several camera flashes, which caused her to squint her eyes. The next
recollection she had, she was naked and appellant "was between her legs," penetrating her with
his penis. Cannon was standing behind appellant, and K.T. believed that Cannon was using a
camcorder, because she could "see the light flashing." K.T. next recalled Cannon penetrating
her while appellant watched, although Cannon was "having problems" because she was "trying
to close [her] legs." 

 K.T. testified that she felt "helpless" and explained that she tried to tell them to stop,
"but I really couldn't move my mouth or my arms or anything. I was trying to but I was very
weak. The first time I tried to say something I was kind of crying . . . I was just saying, 'No.' 
But it wasn't very loud. I noticed I was really weak. I couldn't really do anything." K.T.
testified that when she awoke the next morning, she was naked and lying on the floor in
appellant's bedroom. Appellant told her that she had gotten "so f____d up last night," and that
he had had to wash her clothes. Although still impaired, K.T. got dressed and drove to Nunn's
house. Nunn drove her to a hospital for a rape exam. Police questioned K.T. about the offense
while she was at the hospital. 

 K.T. testified that she had drunk very little alcohol prior to going to appellant's house,
and once she was there, she drank only a sip of one beer and then the vodka shot. K.T.
explained that she was not a heavy drinker, generally, and there was only one time in her life
that she could recall drinking as much or more than she drank that night; but she further
testified that that amount only made her feel "buzzed," and she did not pass out, vomit, or
become incontinent on that occasion. 

 Defense counsel vigorously cross-examined K.T. about how much alcohol she had
drunk, and suggested that K.T. voluntarily drank herself into the incoherent state she was in that
evening. Appellant also offered evidence that K.T. had personal reasons to testify falsely about
the incident. Specifically, defense counsel questioned K.T.'s motives, implying that K.T. had
actually consented to sex with appellant, but later decided to lie so that her on-again, off-again
boyfriend, Nunn, would not be angry with her and would "take her back." (4)

 Results from the rape exam indicated that appellant was the contributor of semen
recovered from K.T.'s vagina. Cannon was ruled out as a contributor. The results of a
urinalysis test for gamma hydroxybutyrate (GHB), commonly known as a date-rape drug, was
negative. However, at trial, the State offered the testimony of a toxicologist who explained
that GHB has a half-life in the body of only twenty minutes to an hour. 

 Appellant's house was searched, and police recovered the following items: a plastic
coke bottle containing GHB; two exposed but undeveloped rolls of film from Diaz's bedroom;
one Polaroid photograph depicting K.T. passed-out, unclothed, and lying in the hallway; and
three Polaroid close-up shots of her vagina. (5)

 The State offered into evidence photographs made from the rolls of undeveloped film
in two distinct groups. Except for the one Polaroid photograph of K.T. lying naked on the
floor, appellant objected to all of the photographs based on Rules of Evidence 404(b) and 403. 
The first group, State's exhibits 71 through 76 and 78, included two photographs from the
undeveloped rolls of film, which depict an unidentified and unconscious naked woman (6) lying
on a couch or a bed. One photograph from this group shows a man placing a bottle or can into
this woman's vagina, another shows a close-up of her vagina, and another shows an unidentified
man performing oral sex on her.

 The second group of photos, State's exhibits 77 and 82 through 97, depict various
people in and around appellant's house. One photograph, State's exhibit 95, shows Cannon and
two other participants willingly engaging in a sex act and posing for the camera. This
photograph, along with State's exhibits 96 & 97, is one in a series of photographs depicting
Cannon, another woman (who is clearly conscious), and another man. State's exhibit 95
depicts the naked woman lying on a bed between Cannon and the other man. She has her legs
spread for the camera while Cannon and the other man are kissing her neck and face. State's
exhibit 96 depicts the same woman and Cannon. Her legs are spread wider, she is smiling at
the camera, and she is spreading her labia open with the fingers of one hand. State's exhibit 97
is a close-up shot of the same woman's vagina. In this photo, she is spreading her labia with
both hands. Cannon's knee and the other man's hand are also visible in the background of the
photo. 

 Also within this second group of photos is a photograph of Diaz, which was admitted
as State's exhibit 77. He is shown having what appears to be consensual intercourse with an
unidentified woman in his bedroom. 

 Another series of photographs from this second group depicts appellant, Cannon, and
Diaz in and outside of appellant's house. Several photographs show Cannon intoxicated, sitting
or lying on the ground. In one photograph, he is vomiting on the ground. In another
photograph, appellant is "flashing" a gang sign in the kitchen of the house, and in another
photograph, he is urinating on the side of the house. 

 In sum, the State argued primarily that all of the photographs were admissible to
connect appellant and Cannon as parties to the instant offense, to show motive, and to rebut
appellant's defensive theories that it was K.T. who brought the GHB, voluntarily became
intoxicated, and consented to the sexual acts. 

 The trial judge conducted extensive hearings outside the jury's presence on the
admissibility of these photographs. She examined all of the photographs, articulated their 
relevance and probative value on the record, (7) and allowed the parties to fully develop their
evidentiary arguments. (8)
 She initially ruled that only some of the photographs were admissible,
but toward the end of testimony the next day, the State reoffered the rest (9) and the trial judge
admitted them. She noted, inter alia, that they tended to show the knowledge and participation
of all three men-appellant, Cannon, and Diaz-in this incident as well as the other two incidents. 


Holdings of the Court of Appeals 

 The court of appeals reversed the trial court's judgment, holding that admission of the
photographs from the undeveloped rolls of film violated Rules of Evidence 401, or 404(b), and
403, and that their improper admission was harmful. Specifically, the court of appeals
concluded that the trial court erred in admitting the two sets of photographs because "the
events depicted . . . did not have any tendency to make the existence of a fact of consequence
more or less probable" (citing Rule 404(b)), and they "improperly encouraged the jury to
convict appellant on the basis of his . . . debauched character." (citing Rule 403). Casey v.
State, 160 S.W.3d at 226-28. 

Standard of Review

 When reviewing a trial court's ruling on the admission of evidence, an appellate court
applies an abuse of discretion standard of review. Montgomery v. State, 810 S.W.2d 372, 391
(Tex. Crim. App. 1991) (op. on reh'g). A trial court abuses its discretion when its decision lies
outside the zone of reasonable disagreement. Green v. State, 934 S.W.2d 92, 101-102 (Tex.
Crim. App. 1996). 

Applicable Law

 Evidence that does not have relevance apart from character conformity is inadmissible. 
Tex. R. Evid. 404(b). Extraneous-offense evidence is not inadmissible under Rule 404(b) if
the extraneous-offense evidence is relevant to a fact of consequence apart from its tendency
to show conduct in conformity with character. (10) Johnston v. State, 145 S.W.3d 215 (Tex.
Crim. App. 2004). Extraneous-offense evidence is not inadmissible under Rule 404(b) when
it is offered to rebut an affirmative defense or a defensive issue that negates one of the
elements of the crime. Id.; Powell v. State, 63 S.W.3d 435, 438-440 (Tex. Crim. App. 2001). 


 Once a trial court rules that uncharged misconduct evidence is not barred under Rule
404(b), the opponent of the evidence may further object under Rule 403. Santellan v. State,
939 S.W.2d 155, 169-70 (Tex. Crim. App. 1997). Rule 403 provides: "Although relevant,
evidence may be excluded if its probative value is substantially outweighed by the danger of
unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue
delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403. Relevant
evidence is generally admissible, but it is properly excluded under Rule 403 when its probative
value is substantially outweighed by the danger of unfair prejudice. In keeping with the
presumption of admissibility of relevant evidence, trial courts should favor admission in close
cases. Montgomery, 810 S.W.2d at 389.

 The term "probative value" refers to the inherent probative force of an item of
evidence-that is, how strongly it serves to make more or less probable the existence of a fact
of consequence to the litigation-coupled with the proponent's need for that item of evidence. 
Gigliobianco v. State, PD-1878-05, Slip op. *5 (Tex. Crim. App. 2006). When conducting
the balancing test under Rule 403, the trial court determines whether the probative value of the
evidence is substantially outweighed by one of the following countervailing considerations
listed in the rule. See, e.g., Crank v. State, 761 S.W.2d 328, 342 n.5 (Tex. Crim. App. 1988),
overruled on other grounds by, Alford v. State, 866 S.W.2d 619, 624 (Tex. Crim. App. 1993). 

 "Unfair prejudice" refers to a tendency to suggest decision on an improper basis,
commonly, though not necessarily, an emotional one. Gigliobianco, PD-1878-05, slip op. *5
(citing Montgomery v. State, 810 S.W.2d at 389). Evidence might be unfairly prejudicial if,
for example, it arouses the jury's hostility or sympathy for one side without regard to the
logical probative force of the evidence. Id. at *5-6. 

 "Confusion of the issues," refers to a tendency to confuse or distract the jury from the
main issues in the case. Id. at *6. Evidence that consumes an inordinate amount of time to
present or answer, for example, might tend to confuse or distract the jury from the main issues. 
"Misleading the jury," refers to a tendency of an item of evidence to be given undue weight by
the jury on other than emotional grounds. For example, "scientific" evidence might mislead
a jury that is not properly equipped to judge the probative force of the evidence. Id. "Undue
delay" and "needless presentation of cumulative evidence" concern the efficiency of the trial
proceeding rather than the threat of an inaccurate decision. Id. 

 In sum, a trial court must balance (1) the inherent probative force of the proffered item
of evidence along with (2) the proponent's need for that evidence against (3) any tendency of
the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to
confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given
undue weight by a jury that has not been equipped to evaluate the probative force of the
evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate
amount of time or repeat evidence already admitted. Id. at * 6-7.

Analysis and Holdings 

 State's Exhibits 71 through 76 & 78 and 95 through 97 

 Exhibits 71 through 76 and 78 are photographs depicting an unidentified woman (or
possibly two different women), who is naked and unconscious. Exhibits 95 through 97 depict
another unidentified woman who is naked and clearly conscious.

Rule of Evidence 404(b)

 We hold that these photographs were not inadmissible under Rule 404 because they had
logical relevance apart from character conformity. Appellant and his co-defendant Cannon
repeatedly urged the defensive theories of consent and voluntary intoxication, (11) as well as their
theory that K.T. fabricated the "sexual assault" story to save her relationship with Nunn, her
former boyfriend. The defense also focused upon K.T.'s purportedly low moral character as
a stripper, questioning her about whether she wore panties or a G-string as a dancer and whether
dancers at topless clubs commonly used GHB. When K.T. denied both having consensual sex
and posing for the Polaroid photographs with appellant and Cannon, the defense then
rhetorically asked her, "You just dance for a living, you don't consent to photographs."

 We have held that when the defensive theory of consent is raised in a prosecution for
sexual assault, the defendant necessarily disputes his intent to engage in the alleged conduct
without the complainant's consent and places his intent to commit sexual assault at issue. 
Rubio v. State, 607 S.W.2d 498, 501 (Tex. Crim. App. 1980). 

 We have also stated that "evidence of a defendant's particular modus operandi is a
recognized exception to the general rule precluding extraneous offense evidence, if the modus
operandi evidence tends to prove a material fact at issue, other than propensity." Owens v.
State, 827 S.W.2d 911, 915 (Tex. Crim. App. 1992). In the context of extraneous offenses,
modus operandi refers to "a defendant's distinctive and idiosyncratic manner of committing
criminal acts." Id. at 914. Although the modus operandi theory of admissibility under Rule
404(b) usually refers to evidence offered to prove the identity of a specific person, its use is
not so limited in the law. Modus operandi may also encompass the "doctrine of chances"
theory to show lack of consent, motive, and the manner of committing an offense. We have
recently noted that "evidence of a remarkably similar act might be admissible to prove the
corpus delicti (the crime itself), intent, or lack of consent under 'the doctrine of chances.'" 
Daggett v. State, 187 S.W.3d 44, 453 n.18 (Tex. Crim. App. 2005); see also Martin v. State,
173 S.W.3d 463, 467-68 (Tex. Crim. App. 2005) (lack of consent); Robbins v. State, 88
S.W.3d 256, 265-69 (Tex. Crim. App. 2002)(Cochran, J., concurring) (corpus delicti);
Plante v. State, 692 S.W.2d 487, 491-92 (Tex. Crim. App. 1985) (intent). 

 The State's theory of relevance for offering the photographs of the other unconscious
woman was that, because the defense had attacked K.T.'s character and argued that the
evening's activities were her idea and that she provided the GHB, it was entitled to show that
this was not an isolated event. Instead, "[t]he photographs of the extraneous sexual assault on
an apparently unconscious woman in the [appellant's] residence are illustrative of a motive to
engage in nonconsensual sexual activity for the purpose of photographing the activity." State's
Brief at 13. Although the defensive theory of K.T.'s bad character and her willing participation
in this type of sexual encounter and photography might appear plausible on its face, its
plausibility diminishes if the same scenario is repeated with other women on other occasions.

 Before admitting the photographs, the trial judge noted numerous similarities between
the charged incident and that depicted in the photographs of the unconscious woman:

 1) the events occurred in the same bedroom on the same bedding in appellant's
home;

 2) the photographs depicted an unconscious woman being sexually abused;

 3) the photographs showed a group of men, one of whom was having sex with the
unconscious woman while others are present;

 4) the photographs depict a "positioned" unconscious naked woman whose legs
have been spread apart;

 4) one of the men took photographs of the incident.

 K.T. had testified that both appellant and Cannon sexually assaulted her and that both of
them took photographs of the assaults. The Polaroid photographs show her "positioned" in the
same manner as the other unconscious woman. The trial court used the term "spectator sport"
in noting the similarities between the Polaroids of K.T., the photographs of the unconscious
woman, and the photographs of the conscious woman who appeared to be enjoying the
activities. Two of the women did not appear to be consenting to the activities, while the
third-as a contrast-did. Consent versus nonconsent. Drugged versus not drugged. Sexual
abuse versus sexual participation. We conclude that the trial judge did not abuse her discretion
in finding that the photographs of both the unconscious woman and the conscious woman were
relevant for the non-propensity purpose of rebutting the defensive theories that "the stripper"
K.T. brought the GHB, initiated the sexual activity, and consented to the photographic
depiction of it. See Martin v. State, 173 S.W.3d at 466-67; Gipson v. State, 619 S.W.2d 169,
170 (Tex. Crim. App. 1981); 1 Edward J. Imwinkelried, § 5:3 (Rev. ed. 2003).; Tex. R.
Evid. 404(b). The court of appeals was mistaken in concluding that the photographs "did not
have any tendency to make the existence of a fact of consequence in this cause more or less
probable." Casey, 160 S.W.3d at 228. See Powell v. State, 63 S.W.3d at 439; Gipson, 619
S.W.2d at 170 (extraneous offenses may be admitted if they are shown to be material and
relevant to a contested issue); Albrecht v. State, 468 S.W.2d 97, 100 (Tex. Crim. App. 1972). 

Rule of Evidence 403

 We further hold that the probative value of the photographs of the unconscious female
(or females) and of the conscious female was not substantially outweighed by the danger of
unfair prejudice under Rule 403. The inherent probative force of these exhibits was its
tendency to show that K.T. did not consent to the sexual activity. The probative force of the
evidence is coupled with the State's need for the evidence, and they are placed on one side of
the scale. Gigliobianco v. State, PD-1878-05, slip op. *7.

 Whether K.T. consented was the ultimate issue to be established by the parties in the
litigation. See, e.g., Martin, 173 S.W.3d at 466; Boutwell v. State, 719 S.W.2d 164, 179 (Tex.
Crim. App. 1985) (a successful conviction for sexual offense often depends primarily on
whether the jury believes the complainant). Appellant sought to show through extensive
argument and testimony that K.T. was a willing participant in the sex act, and thus, no sexual
assault could have occurred. Appellant and Cannon offered evidence that K.T. initiated the
sexual activity with appellant; that she brought the GHB with her; that she could not remember
precisely the events of the evening due to her voluntary intoxication, and if she could
remember, she was lying to the jury; that she was a stripper, and therefore, she naturally
consented; and that her desire to win back the affections of Nunn drove her to falsely accuse
appellant and Cannon of non-consensual sex. 

 State's exhibits 71-76 & 78's probative force centers in their inherent ability to show
that it was unlikely that K.T. and at least one other woman were consenting to the sexual
activity. See Johnson v. State, 68 S.W.3d 644, 651-52 (Tex. Crim. App. 2002); Wheeler v.
State, 67 S.W.3d 879, 889 (Tex. Crim. App. 2002); Albrecht v. State, 486 S.W.2d at 100
(before evidence of collateral crimes is admissible, a relationship between such evidence and
the evidence necessary to prove that the accused committed the crime for which he stands
charged must be shown). Moreover, the record reflects that it was obvious to the trial court
that the woman in State's exhibits 71-76 was unconscious and not participating because she
was in the same position from frame to frame with her mouth agape, despite having large
objects inserted into her vagina and having cunnilingus performed on her. The trial court, thus,
explicitly reasoned that these photographs were supportive of a significant fact of
consequence--that K.T., like the other woman, was unconscious and did not consent. We
conclude that the photographs of the other unconscious woman (or women) were strong
evidence that K.T. did not consent on the night in question. We couple this strong probative
force with the State's need for the evidence. 

 K.T. was largely incoherent throughout the evening, and at trial, both appellant and
Cannon vigorously challenged her ability to remember the events as they unfolded. For
example, in opening argument, Cannon's attorney chided that "the only evidence of sexual
contact will come from [K.T.]," "who will tell you in her drunken stooper [sic] that she recalls
something." Thus, the State needed the evidence to counterbalance the various defensive
theories advanced throughout the trial. We conclude that the probative value, coupled with the
State's need for the evidence, would lead a reasonable trial judge to assign considerable
probative weight to the photographs of the unconscious woman or women. See Gigliobianco
v. State, PD-1878-05, Slip op. *7. Similarly, the photographs of the conscious woman are a
contrast to those of K.T. and the unconscious woman, but they also demonstrate the modus
operandi of what the trial judge termed "the spectator sport" of having group sexual activities,
both consensual and non-consensual, and photographing them.

 The inherent probative value and the State's need for the evidence are then balanced
against the Rule 403 counterfactors: the tendency of the evidence to (1) suggest a decision on
an improper basis, (2) confuse or distract the jury from the main issues, (3) be given undue
weight by a jury that has not been equipped to evaluate the probative force of the evidence, or
(4) consume an inordinate amount of time or repeat evidence already admitted. See id at *7-8.

 Appellant complained that these photographs were unfairly prejudicial. (12) Therefore,
we shall determine whether the probative value of the evidence was substantially outweighed
by the danger of unfair prejudice. See Tex. R. Evid. 403.

 Unfair prejudice refers not to an adverse or detrimental effect of evidence but to an
undue tendency to suggest a decision on an improper basis, commonly an emotional one. See
Old Chief v. United States, 519 U.S. 172 (1997). Unfair prejudice does not arise from the
mere fact that evidence injures a party's case. Virtually all evidence that a party offers will be
prejudicial to the opponent's case, or the party would not offer it. Cohen v. State, 849 S.W.2d
817, 820 (Tex. Crim. App. 1993). Evidence is unfairly prejudicial only when it tends to have
some adverse effect upon a defendant beyond tending to prove the fact or issue that justifies
its admission into evidence. United States v. Figueroa, 618 F.2d 934 (2d Cir. 1980). The
prejudicial effect may be created by the tendency of the evidence to prove some adverse fact
not properly in issue or unfairly to excite emotions against the defendant. See id. 

 The photographs of the naked unconscious woman (or women) having sex acts
performed upon them were certainly prejudicial. And it is undisputed that the photographs
would generate an emotional response. See Wheeler, 67 S.W.3d at 889 (evidence of an
extraneous sexual offense will always carry emotional weight and the danger of impressing the
jury in an irrational and indelible way). However, the trial judge did not abuse her discretion
in declining to find that the risk of unfair prejudice from admission of the photographs
substantially outweighed their probative value.

 First, these photographs are circumstantial evidence that K.T. did not consent in the
instant offense. See Cohn, 849 S.W.2d at 820. The photographic evidence showing both an
unconscious woman and a contrasting conscious woman tends to corroborate K.T.'s testimony
that she, like the other unconscious woman, did not consent to either the sex or the
photography. See id. Like all corroborating evidence, because it is consistent with the K.T.'s
story, it has a tendency to make her testimony more plausible. 

 Second, the evidence demonstrated a modus operandi of group sex, drugs, and
photography and rebutted the defensive theory that K.T. brought the drugs, initiated the sex, and
consented to the photography. Although this evidence might have been inadmissible under
Rule 403 had the defense not put K.T.'s character, motives, recollection, and conduct on trial,
once he chose that strategy, the trial judge did not abuse her discretion in permitting the State
to rebut it with modus operandi evidence. The State had no other means to rebut the defense
theories, and this rebuttal evidence was not offered merely to excite emotions against the
defendant. See id.; Wheeler v. State, 67 S.W.3d at 889 (admission of State's rebuttal
testimony of extraneous-offense victim did not offend Rule of Evidence 403). 

 In Montgomery v. State, we explained that "[w]hen the proponent has other compelling
or undisputed evidence to establish the proposition or fact that the evidence goes to prove, the
[probative value of the evidence] will weigh far less than it otherwise might in the
probative-versus-prejudicial balance." 810 S.W.2d at 390. Here, the four Polaroid
photographs of K.T. depicting her naked and unconscious, including the close-up shots of her
vagina, were not very compelling, standing alone, to show her lack of consent. (13) Likewise,
without the benefit of the photographs of the other women, K.T.'s testimony could have been
easily discounted by the jury due to her intoxication and intermittent recollection of the
events. The trial judge, who was present in the courtroom, was better able to gauge the tone
and tenor of K.T.'s testimony and of the defense cross-examination than are we. As noted
above, the trial judge conducted extensive hearings outside the jury's presence concerning the
admission of this evidence. Hers was not a hasty or unreflective ruling. Accordingly, we
conclude that she did not abuse her discretion in deciding that the probative value of these
photographs was not substantially outweighed by the risk of unfair prejudice. State's
exhibits 77 and 82 through 94

 On the other hand, we agree with the court of appeals' ultimate conclusion that State's
exhibit 77 (Diaz having sex with an unnamed female) and State's exhibits 82 through 94
(various photographs of Cannon, who appears to be very intoxicated, and two of appellant-one
wherein he is urinating on the side of a building, and in another, he is flashing a gang sign) were
inadmissible, as they were not supportive of a fact of consequence to the proceedings. See
Tex. R. Evid. 401, 402; Casey, 160 S.W.3d at 228. The State argued that these photographs
were admissible to show the continuity of the time-frame in which the other photographs on
the two rolls of film were taken, but the probative value of demonstrating the time-frame is
substantially outweighed by the risk of unfair prejudice of admitting otherwise irrelevant
photographs. However, we conclude that the admission of these photographs was harmless. 

 Texas Rule of Appellate Procedure 44.2(b) provides that an appellate court must
disregard a non-constitutional error that does not affect a criminal defendant's "substantial
rights." Under that rule, an appellate court may not reverse for non-constitutional error if the
court, after examining the record as a whole, has fair assurance that the error did not have a
substantial and injurious effect or influence in determining the jury's verdict. See Garcia v.
State, 126 S.W.3d 921, 927 & n.9 (Tex. Crim. App. 2004) (noting adoption of federal non-constitutional error standard as explained in Kotteakos v. United States, 328 U.S. 750,
764-765 (1946)). 

 After examining the record of appellant's trial as a whole, we have fair assurance that
the error did not have a substantial and injurious effect or influence in determining the jury's
verdict. First, the photographs of Cannon, appellant, and Diaz "partying" were not scandalous
or shocking, but, were innocuous in comparison to both the photographs of K.T. and those of
the other women. Second, except for one comment during closing argument, the State did not
emphasize the evidence. There was no mention of gang affiliation or alcohol addiction;
instead, the State's sole comment was directed at showing that appellant and Cannon acted
together, a strategy that obviously failed, as the jury acquitted Cannon. Third, there was very
little contemporaneous testimony concerning the photographs when they were admitted into
evidence. Fourth, this jury was manifestly able to consider the probative evidence and separate
it from marginally relevant evidence because it did acquit Cannon and convicted appellant of
the lesser-included offense of sexual assault rather than the charged offense of aggravated
sexual assault. We therefore conclude that the erroneous admission of State's exhibits 77 and
82 through 94 was harmless error under Tex. R. App. P. 44.2(b).

II. 

 The court of appeals further held that the use of the word "victim"in the jury charge
constituted an impermissible and harmful comment on the weight of the evidence. Casey v.
State, 160 S.W.3d at 230. Defense counsel objected to the use of the word "victim" in the
charge. The conference on the charge proceeded, in pertinent part, as follows: 

Counsel: Judge, I've got an objection to the Charge. .... [T]he use of the word
victim, I think is a misapplication.

******

The Court: That's what the Code says. The victim of the offense is something they
will have to decide. 

Co-counsel: I think there's case law, I'm not sure exactly what it is. I'm not - that's
an impermissible comment on the evidence. 

Counsel: On Page 3. Judge, 3, says to the victim of the offense.

The Court: Which is what the Indictment says.

Counsel: That specifically is calling her a victim. I think that's an impermissible
comment to the Jury. 

The Court: Now, if you find from the evidence beyond a reasonable doubt, that's
something they have to find. David Casey, alone or as a party knowing,
knowingly or intentionally - okay. 2201 aggravated sexual assault uses
the word victim of the offense. On page 1, that's all that's doing is giving
them the law. That's not - you know and you have to quote from the law
to give them the law. I mean I can't substitute my choice of a word for
what the Legislature picked. Now, the Indictment - I mean the State's
got to prove what's in there. And I don't think I can give them some other
burden. And all the Indictment is doing is tracking the wording of the
statute. That's overruled.

Counsel: Judge, just to make sure I've got the objection stated right, on Page 3
where it says [K.T.] is the victim of the offense, by designating her as a
victim it is our position the Court is instructing the Jury as a matter of
law that she is a victim and impermissibly commenting on the weight and
we object to the use of that terminology. 

The Court: That - this is the application paragraph that we are talking about on page
3 and of course - and it will be the same in the other charge, I believe. 
Now, if you find from the evidence beyond a reasonable doubt, and it's
followed by unless you so find beyond a reasonable doubt or if you have
a reasonable doubt thereof you will acquit the Defendant of aggravated
sexual assault and next consider the lesser included offense of sexual
assault. That being the application paragraph, that being the allegation
which does track the statute that is set out by the State in the Indictment,
the Court - well, I can't change the wording of the Indictment. 

Counsel: And it is our position that you can simply put [K.T.] with intent of
facilitating without designating her and identifying her. 

The Court: The law says you have to prove she is the victim of the offense. And so
the State's got to prove that. I can't remove an element of proof. 

Co-Counsel: Can we put in the alleged victim, include the word alleged?

The Court: No, because the whole wording of the paragraph says that that's what the
State's got to prove. I would be amending - no, I can't do that. That's got
- the application paragraph has got to track the Indictment. 

The application portion of the jury charge read as follows: 

 Now if you find from the evidence beyond a reasonable doubt that . . .
[appellant], acting alone or as a party, did . . . knowingly or intentionally cause
penetration of the female sexual organ of [K.T.], without the consent of [K.T.],
by . . . the sexual organ of [appellant], and [appellant], acting alone or as a party,
did administer or provide a drug, namely: [GHB] to [K. T.], the victim of the
offense, with the intent of facilitating the commission of the offense, then you
will find the defendant guilty of aggravated sexual assault, as charged in the
indictment.

 Texas Penal Code section 22.021(a)(1)(A)(i),(2)(A)(vi) provides that a person commits
aggravated sexual assault if he "administers or provides flunitrazepam, otherwise known as
rohypnol, [GHB], or ketamine to the victim of the offense with the intent of facilitating the
commission of the offense." (emphasis added). Accordingly, the Penal Code requires that the
State prove that the intoxicant was administered to a "victim." 

 Article 36.14 of the Code of Criminal Procedure requires that a trial court provide a
jury charge "distinctly setting forth the law applicable to the case." Tex. Code Crim. Proc. 
art 36.14 (Vernon Supp. 2006-2007). The charge here set forth the law applicable to the case
by tracking the language of the statute. See Watts v. State, 99 S.W.3d 604, 607, 612 (Tex.
Crim. App. 2003); Chambers v. State, 700 S.W.2d 597, 599 (Tex. Crim. App. 1985). 
Moreover, we are not persuaded that the charge as written "assume[d] the truth of a
controverted issue," see Whaley v. State, 717 S.W.2d 26, 32 (Tex. Crim. App. 1986), or that
the appearance of the word "victim" in the charge without the modifier "alleged" is a comment
by the trial court which assumes the truth of a controverted issue-the issue of consent. Cf.
Veteto v. State, 8 S.W.3d 805, 817 (Tex. App.--Waco 200, pet. ref'd) (charge containing
extra-statutory language construed as a comment on the weight of the evidence). The cases
cited and relied upon by the court of appeals to reverse the conviction for jury charge error are
inapposite to the case at hand, and therefore, we see no need to discuss them at length. 

 Because the jury charge tracked the language of the statute, the trial court did not abuse
its discretion by including the word "victim" in the charge. See Woods v. State, 152 S.W.3d
105, 115 (Tex. Crim. App. 2004). We decline appellant's invitation to act as a super-legislature and rewrite this section of the Penal Code. 

III. 

 We reverse the judgment of the court of appeals. We remand the cause to the court of
appeals to address appellant's remaining points of error. 

DELIVERED FEBRUARY 28, 2007

PUBLISH
1. By the time of trial, K.T. had become a stripper at the topless bar.
2. K.T. testified that she had one-and-a-half alcoholic beverages at the club before leaving for
appellant's house.
3. K.T. testified that appellant, Cannon, and/or Diaz pressured her to drink the shot by saying,
"Don't be a pussy like your boyfriend, Chris [Nunn]."
4. Appellant further sought to demonstrate that because K.T. was a stripper, she was the kind
of person who would consent to the sex acts performed on her. 
5. The court of appeals held that the three close-up Polaroid photographs of K.T.'s vagina were
not inadmissible. Appellant did not object to the admission of the single Polaroid photograph of K.T.
lying naked on the floor of the hallway. 
6. There was some discussion outside the presence of the jury about whether the photographs in
this group depicted one or two individual females. At some point during the hearing, however, the
parties and the court began to refer to all of these photographs as the one unconscious woman. It
appears to us, however, that the subject of State's exhibit 78 is not the same woman as depicted in
State's exhibits 71 through 76. 
7. The trial judge carefully examined the photographs:


 Well, it appears in some of these photographs that there are a couple of
photographs of a female-there's one photograph where you can't tell who the girl is
because she's covered up with pillows. There are two photographs, three photographs
of a female where it appears she is clearly conscious . . . In another one she appears to
be smiling in the picture, and appears to be doing various [sex] acts. So in those I
don't believe the girl is unconscious. They are very different from these where in some
of these photographs the position of the arms, which appear to be limp, are in exactly
the same position. Where it appears that she's got a Coke or beer can shoved up her
vagina . . . . And [she is] also exactly in the same position at another time that a male
appears to be having oral sex with her. This appears to be a girl who is unconscious. . .
. They are very different from the other photographs.


Once the trial judge separated these pictures into two categories-one unconscious woman (or perhaps
two such women) unaware that she was being photographed while having sex acts performed upon her
and a second, conscious woman who appeared to enjoy the sex acts and was aware of being
photographed-she noted,


 The defensive theory that appears to have been raised in this case through questions
that were asked and statements that were made to the complainant on the stand, isn't it
a fact that you took the GHB in there. Isn't it a fact you consented to these sexual acts.
. . . . From the context of all these photographs there's an appearance that these are
some sort of spectator sport, where one person is having sex and other people are
around, at least one other person taking the photographs. . . . [I]t appears in the
photographs that the-of the two different girls, that the location of the sexual acts that
are taking place with both girls appear to be on the same bed. The bedding is the
same. . . . There are multiple people involved in these situations. At least three
different males.


The trial judge then explained that "there is great relevance to at least some of the photographs" which
showed "an unconscious girl being sexually abused" in a manner that was very similar to that shown in
the Polaroid photographs of the present incident and other photographs which showed another similar
incident except that the girl in those pictures appeared to be conscious and consensually participating in
the sex acts. The trial judge noted that Jesse Diaz appeared in the photographs of the unconscious
woman and "[t]here's testimony that Jesse Diaz is the one who actually delivered the drug to
complainant in this case." She noted that "[t]here are photographs of all three people that were present
during this offense, according to the complainant, in this roll of film. And they tend to show the nature
of their relationship, a preoccupation or an interest or amusement in seeing people intoxicated or passed
out . . . which to me is relevant to this."
8. The State emphasized that the "whole defense so far, what the Jury has heard, has been that
the complainant must have brought this GHB with her. That's what they have argued. And I expect
that later testimony will be that-and it sounds like there's been some kind of consensual sex here. We
are entitled under the law to rebut that to show to the Jury that that's not consensual and to show the
motivation, the intent, the scheme, the plan, all of those things I think are apparent from the
photographs."

9. The State said that the two defendants, appellant and Cannon, had argued that neither of
them were involved with the photographs, "so they can then point the finger at Jesse Diaz." Further, the
State noted that the defense was arguing that Cannon did not live at the house and was trying to
dissociate himself from this "spectator sport, and sexual assault scenario that's going on in this house."
10. The text of Rule 404(b) provides, in pertinent part, as follows. "Other Crimes, Wrongs or
Acts.--Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in
order to show action in conformity therewith. It may, however, be admissible for other purposes, such
as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or
accident . . . ."
11. Elliott v. State, 858 S.W.2d 478, 485 (Tex. Crim. App. 1993).
12. Although there were extensive hearings on the admissibility of the photographs outside the
presence of the jury, the time spent actually presenting the evidence to the jury was very short. 
13. Through cross-examination, appellant challenged K.T.'s ability to identify herself in State's
exhibits 13 through 15, which as noted above, where close-up shots depicting her genital area only. 
The questioning proceeded as follows:

 Defense counsel: The truth is that the only reasons you can recognize that those foggy
photos of someone's - between someone's legs is because you posed
for them and y'all laughed and joked about them, isn't that right? 

 K.T.: No.

 Defense counsel: They were lousy photographs, weren't they?

 K.T.: [non-responsive answer]

 Defense counsel: Unless of course you were consenting and laughing and joking about it,
right?