**Affirmed and Opinion Filed July 20, 2023**



In The
## Court of Appeals
## Fifth District of Texas at Dallas

**No. 05-21-00626-CR**

**CURTIS TYRONE BULLOCK, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 265th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F19-14101-R**

## OPINION

Before Justices Reichek, Goldstein, and Kennedy[1]
Opinion by Justice Goldstein

Appellant Curtis Tyrone Bullock appeals his judgment of conviction by jury for the murder of his wife, Yvonne Perkins. In five issues, appellant contends that the evidence was insufficient to prove the actus reus alleged in the indictment, the evidence was legally and factually insufficient to support the trial court's negative finding on sudden passion, the trial court erred by including a definition of

---

[1] The Honorable Justice David J. Schenck was originally a member of this panel. The Honorable Justice Nancy Kennedy succeeded Justice Schenck when his term expired on December 31, 2022. Justice Kennedy has reviewed the briefs and the record.

"reasonable doubt" in the jury charge, and the trial court lacked jurisdiction because the cause was not transferred to its docket. We affirm.

## BACKGROUND

Appellant was married to Perkins for fourteen years, and the couple lived together with their three children in Cedar Hill, Dallas County, Texas. On the morning of August 8, 2019, appellant called 9-1-1 and requested that someone be sent to his address. He provided no other information. At around 7:35 a.m., officers from the Cedar Hill Police Department arrived at the house, knocked on the door, and were let in by one of appellant's children about fifteen minutes later. The child told the officers that his parents were not answering their bedroom door. The officers knocked on the bedroom door, but there was no answer. One of the officers tried to kick down the door but felt appellant "wrestling against the door" on the other side. After a second kick, appellant fell away from the door, and the officers entered the bedroom. Appellant, now on the ground, had a laceration on his neck and could not speak. Perkins was on the bed, face down, in a pool of blood. The officers found a bloody knife on the ground. Paramedics from the Cedar Hill Fire Department later arrived on the scene and confirmed that Perkins was deceased. They examined appellant, noting that he appeared to have self-inflicted wounds to his wrists, chest, and throat. The officers later found a bloody hammer in the room as well.

After an investigation, a grand jury empaneled by the 204th Judicial District Court returned an indictment charging appellant for the murder of Perkins. The

–2–

indictment stated, in relevant part, that appellant intentionally and knowingly caused Perkins's death "by stabbing deceased with a knife, a deadly weapon." Appellant was tried and found guilty by a jury in the 265th Judicial District Court.

The issue of punishment was tried to the court. Appellant testified on his own behalf about the events leading to Perkins's death, which included details of a heated argument. During closing argument, appellant's counsel argued that the evidence supported a finding of sudden passion. The trial court rejected the sudden-passion defense and sentenced appellant to fifty years' confinement. This appeal followed.

**DISCUSSION**

**I.    VARIANCE**

In his first issue, appellant asserts that the evidence was legally insufficient to support the actus reus element of murder as charged in the indictment. Specifically, appellant argues that there was a fatal variance between the allegations in the indictment and the proof submitted at trial. The State responds that there was no variance, and if there were, it was immaterial.

When reviewing a conviction for legal sufficiency, we consider whether after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Liverman v. State*, 470 S.W.3d 831, 835–36 (Tex. Crim. App. 2015)). We measure whether the evidence presented at

trial was sufficient to support a conviction by comparing it to "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

"A 'variance' occurs when there is a discrepancy between the allegations in the charging instrument and the proof at trial." *Gollihar v. State*, 46 S.W.3d 243, 246 (Tex. Crim. App. 2001). The issue of variance is "subsumed" within the *Jackson* legal-sufficiency standard. *Id.* at 246–47. Only material variances affect the hypothetically correct charge. *Hernandez v. State*, 556 S.W.3d 308, 312 (Tex. Crim. App. 2017). A variance is material, and thus fatal to the conviction, if it prejudices the defendant's substantial rights. *Id.* In determining whether the defendant has been prejudiced by the variance, we consider "whether the indictment, as written, informed the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial, and whether prosecution under the deficiently drafted indictment would subject the defendant to the risk of being prosecuted later for the same crime." *Gollihar*, 46 S.W.3d at 257 (quoting *United States v. Sprick*, 233 F.3d 845, 853 (5th Cir. 2000)).

Here, the indictment alleged that appellant caused Perkins's death by "stabbing [her] with a deadly weapon, a knife." The evidence at trial included the testimony of Dr. Jessica Dwyer, a forensic pathologist in the Dallas County Medical Examiner's office. Dr. Dwyer conducted the autopsy of Perkins's body. She testified that Perkins's body showed both blunt-force and sharp-force injuries, multiple of which could have been lethal. Dr. Dwyer concluded that the combination of blunt- and sharp-force injuries caused the death. She explained that the blunt-force injuries could have been caused by the hammer found in appellant's bedroom. Appellant asserts that there was a fatal variance between the indictment and proof. Appellant argues that the actus reus element of the offense was the stabbing and the State failed to prove beyond a reasonable doubt that Perkins died as a result of stabbing only. We reject this argument.

In *Johnson v. State*, the court of criminal appeals explained that there are two types of variances: those involving the statutory language that *defines* the offense and those relating to a non-statutory allegation that *describes* the offense in some way. 364 S.W.3d 292, 294–95 (Tex. Crim. App. 2012). The Court explained that in murder cases, each victim is the allowable unit of prosecution. *Id.* at 295. Thus, if the indictment alleges that the defendant killed person A and the evidence at trial proves the defendant killed person B, then the variance is fatal because "the murder of one individual is a different offense from the murder of a different individual." *Id.* at 296. However, a variance involving "a non-statutory allegation that has

nothing to do with the allowable unit of prosecution . . . cannot be a basis for saying that the proved offense is different from the one that was pled." *Id.* at 297. In explaining the difference, the Court used the following example:

> "Stabbing with a knife" and "bludgeoning with a baseball bat" are two possible ways of murdering Dangerous Dan, but they do not constitute separate offenses. These methods of committing murder do describe an element of the offense: the element of causation. But murder is a result-of-conduct crime. What caused the victim's death is not the focus or gravamen of the offense; the focus or gravamen of the offense is that the victim was killed. Variances such as this can never be material because such a variance can never show an "entirely different offense" than what was alleged.

*Id.*; *see also Zuniga v. State*, 393 S.W.3d 404, 411 (Tex. App.—San Antonio 2012, pet. ref'd) (concluding that variance between indictment, which alleged death by stabbing, and proof at trial, which the defendant characterized as death by bludgeoning, was immaterial).

The complained-of variance in this case is precisely the kind that the courts in both *Johnson* and *Zuniga* considered as being immaterial. Whether appellant stabbed Perkins to death with a knife, bludgeoned her to death with a hammer, or killed her via a combination of the two is immaterial. The allowable unit of prosecution was the murder of Perkins, and any variance between the indictment and proof at trial regarding the means of committing the murder of Perkins cannot be a basis for overturning the conviction. We overrule appellant's first issue.

## II.    SUDDEN PASSION

In his second and third issues, appellant contends that the evidence was legally and factually insufficient to support the trial court's negative finding on sudden passion.

Murder is typically a first-degree felony. TEX. PENAL CODE ANN. § 19.02(c). It may, however, be reduced to a second-degree offense if, during the punishment phase, the defendant proves by a preponderance of the evidence that he caused the victim's death "under the immediate influence of sudden passion arising from adequate cause." *Id.* § 19.02(d). The murder statute defines both "adequate cause" and "sudden passion." *Id.* § 19.02(a). "Sudden passion" means "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). A defendant raising sudden passion to mitigate a murder conviction must prove that a "passion or an emotion such as fear, terror, anger, rage, or resentment existed[;] that the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion, and the homicide." *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005). "Adequate cause" means "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." TEX. PENAL CODE ANN. § 19.02(a)(1).

Neither ordinary anger nor fear alone raises an issue of sudden passion arising from adequate cause. *Moncivais v. State*, 425 S.W.3d 403, 407 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

Although the issue of sudden passion may be raised only in punishment, it is "analogous to an affirmative defense because the defendant has the burden of proof by a preponderance of the evidence." *Gaona v. State*, 498 S.W.3d 706, 710 (Tex. App.—Dallas 2016, pet. ref'd). As such, a negative finding on sudden passion may be reviewed for legal and factual insufficiency. *Id.*

When reviewing the legal sufficiency of the evidence supporting a negative finding on sudden passion, the standard of review is "the same as the legal sufficiency standard utilized in civil cases." *Id.* First, we review the record for a scintilla of evidence to support the negative finding and disregard all evidence to the contrary unless a reasonable factfinder could not. *Id.* If we find no evidence that supports the finding, we then consider whether the contrary proposition was established as a matter of law. *Id.* We defer to the factfinder's determinations as to the credibility of the testimony and the weight to give to the evidence. *Id.*

If the evidence is legally sufficient, we then turn to factual sufficiency. *See Beltran v. State*, No. 05-19-00017-CR, 2020 WL 4047964, at *3 (Tex. App.—Dallas July 20, 2020, pet. ref'd) (mem. op., not designated for publication) (citing *Smith v. State*, 355 S.W.3d 138, 147–48 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd)). In reviewing the factual sufficiency of a finding rejecting an affirmative defense, we

examine all of the evidence in a neutral light. *Id.* (citing *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013)). A negative finding on sudden passion cannot be overturned unless, after setting out the relevant evidence supporting the verdict, the court clearly states why the verdict is so against the great weight and credibility of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *Id.* (citing *Matlock*, 392 S.W.3d at 671–72).

At the punishment phase, the trial court heard testimony from appellant about the events of the morning of August 8, 2019. During direct examination, appellant gave the following testimony: Perkins woke him up at around 6:00 a.m. to talk about money issues and the two began arguing. In the midst of that argument, he asked her about a man who had been calling her, and she got upset. The couple was yelling at each other, and it was one of the worst fights they had ever had. She told him that she was planning on leaving him and that "she had someone already lined up, just in case I didn't want to act right." At that point, appellant "lost it." He went to her side of the bed; she had stood up and was holding a knife that she kept nearby. She poked him with the knife and he grabbed the hammer. After that, everything was "a blur." When shown photographs of Perkins's injuries taken during her autopsy, appellant could not remember causing any of them. Appellant argues that this evidence conclusively establishes sudden passion and there is no contravening evidence. We disagree. Appellant's testimony conflicts with the testimony of at least three other witnesses.

Appellant's middle child, N.B., testified to the following. On the evening of August 7, N.B. was not hungry, so he skipped dinner and went to bed at around 8:00 p.m. The next morning, he woke up, brushed his teeth, and went to his parents' room to ask for his cell phone. When he knocked, his dad answered the door and N.B. saw Perkins lying on the bed. She was on her side, which was how she usually slept. After a while, N.B. became hungry and went back to his parents' room to ask if his dinner from the night before was in the fridge. Appellant said it was. Appellant "looked like he was okay." N.B. went downstairs to heat up his food when his younger sister came downstairs. He made her some cereal, at which point he heard "a fall" from his parents' room. N.B. thought it was appellant's "controller or something." N.B. then went up to his parents' room a third time to ask appellant what setting he should use on the microwave. He said appellant looked normal and happy. This time, he saw his mother lying on her stomach. He asked appellant if he was okay, and appellant said yes. N.B. then went and heated up his food. He went back to his parents' room a fourth time to ask if his food was hot enough to eat. This time, nobody answered the door. N.B. said that he did not hear his parents arguing that entire time.

Kelly Goffney, appellant's neighbor, testified that on the evening of August 7, he and his daughter went for a walk. They encountered appellant and Perkins, but the couple was not as cordial as usual. Goffney said that appellant was being "standoffish." Goffney also said that in the early morning of August 8, at around

2:00 or 3:00 a.m., he was awakened by his dog barking. Goffney went outside and heard a loud argument coming from appellant's house.

Dr. Dwyer testified about Perkins's injuries. Relevant here, Dr. Dwyer described, and through photographs taken during the autopsy showed, the location of the blunt- and sharp-force injuries on Perkins's head. Perkins had numerous deep wounds on her right ear and the right side of her head. Dr. Dwyer explained that "all of the stab wounds are directed leftward" and "[t]hey're all traveling right to left."

On cross-examination during the punishment phase, the State confronted appellant with the above testimony. Appellant testified that he did not know whether N.B. was awake when appellant and Perkins were arguing. When asked why N.B. did not hear his parents yelling at each other, appellant said that "the door was closed." Appellant was also asked about Goffney's testimony that the argument happened several hours earlier. Appellant said that it was not true and that the argument did not begin until 6:00 a.m. Regarding Dr. Dwyer's testimony, the State asked whether appellant was right-handed or left-handed. Appellant testified that he was right-handed, and this exchange followed:

Q. Okay. Because if you're right-handed, she would have had the injuries on her left side, right, if she was facing you?

A. No, she was at an angle.

Q. Okay. But if she was facing away from you with her back towards you, all her injuries are going to be on her right side because you're right-handed, right, that make sense?

A. No.

–11–

Q. You don't know?

A. No, it doesn't make sense.

Q. It doesn't make sense?

A. No.

Q. But, now, you remember how she was facing you when you were stabbing and clawing her with a hammer?

A. I remember her standing up in front of me, yes.

Q. Okay. But you don't remember what direction she was pointed at, towards you or away from you when you --

A. Towards me.

Q. Towards you? Okay. Now, you remember that. Okay. What was she saying to you when you started stabbing her with a knife?

A. She was -- she was just yelling some curse words and stuff too.

Appellant then described the confrontation in more detail, including that he did not punch Perkins and that at one point, he was holding both weapons at the same time.

On this record, we cannot conclude that the evidence was legally and factually insufficient to support the trial court's negative finding on sudden passion. Appellant's statement that his argument with Perkins began at 6:00 a.m. conflicted with the testimony of N.B. and Goffney. The trial court could have found that the argument occurred several hours earlier in the morning and that the couple was no longer arguing when N.B. was awake. Appellant's testimony about a face-to-face confrontation also conflicted with Dr. Dwyer's testimony about the location of Perkins's injuries. Importantly, appellant's detailed description of the killing—including his positioning relative to Perkins, the fact that he was holding both the

–12–

hammer and the knife at one point, and his testimony that he did not punch Perkins—all conflicted with appellant's own testimony during direct examination that the confrontation was "a blur" and that he did not remember causing Perkins's injuries. As the factfinder during punishment, the trial court was free to find that appellant's version of events was not credible. *See Gaona*, 498 S.W.3d at 710. The trial court could have reasonably found that appellant's argument with his wife happened at 2:00 a.m., as testified by Goffney, and that the couple was no longer arguing at 6:00 a.m., as N.B.'s testimony indicated. Thus, the trial court could have reasonably concluded that the murder did not occur "while the passion still existed and before there was reasonable opportunity for the passion to cool." *See McKinney*, 179 S.W.3d at 569.

We conclude that the evidence was legally and factually sufficient to support the trial court's negative finding on sudden passion and overrule appellant's second and third issues.

III.   JURY CHARGE

In his fourth issue, appellant complains that the jury charge improperly defined "reasonable doubt" in violation of *Paulson v. State*, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000). The portion of the charge that is the subject of appellant's complaint states: "It is not required that the prosecution proves guilt beyond all possible doubt; it is required that the prosecution's proof excludes all reasonable doubt concerning the Defendant's guilt."

In *Geesa v. State*, decided nine years before *Paulson*, the court of criminal appeals adopted a six-paragraph instruction regarding "reasonable doubt" and held that it "shall be submitted to the jury in all criminal cases." 820 S.W.2d 154, 162 (Tex. Crim. App. 1991). The six paragraphs were:

[1] All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that a person has been arrested, confined, or indicted for, or otherwise charged with, the offense gives rise to no inference of guilt at his trial. The law does not require a defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

[2] The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the defendant.

[3] It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all "reasonable doubt" concerning the defendant's guilt.

[4] A "reasonable doubt" is a doubt based on reason and common sense after a careful and impartial consideration of all the evidence in the case. It is the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs.

[5] Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

[6] In the event you have a reasonable doubt as to the defendant's guilt after considering all the evidence before you, and these instructions, you will acquit him and say by your verdict "Not guilty".

*Id.* The *Paulson* Court overruled *Geesa*, holding that the definitions in paragraphs [4] and [5] were redundant and fallacious. *See Paulson*, 28 S.W.3d at 572–73. The Court concluded that the better practice is to give no definition of "reasonable doubt" but that it would not be reversible error to give the *Geesa* instruction if the State and defense agreed to it. *Id.* at 573.

Four years later, the Court expounded on its *Paulson* holding in *Woods v. State*, 152 S.W.3d 105, 115 (Tex. Crim. App. 2004). The issue in *Woods* was whether the trial court erred in submitting a charge to the jury that contained paragraph [3] of the *Geesa* instructions. *Id.* The Court explained that in *Paulson*, it had "overruled the portion of *Geesa* that required trial courts to instruct juries on the definition of reasonable doubt." *Id.* Specifically, the Court stated that *Paulson* "criticized paragraphs [4] and [5] of the *Geesa* instruction as attempting to define reasonable doubt." *Id.* The Court concluded that the trial court did not abuse its discretion by including paragraph [3] in the charge. *Id.* The Court reaffirmed this holding in *Mays v. State*, 318 S.W.3d 368, 389 (Tex. Crim. App. 2010).

Here, appellant complains about the inclusion of paragraph [3] in the jury charge. He asserts that "whether *Paulson* was violated by the instant instruction depends upon if it provided a 'definition' of reasonable doubt." He acknowledges that some courts, including this one, have held that paragraph [3] does not define "reasonable doubt." *See, e.g.*, *Bates v. State*, 164 S.W.3d 928, 931 (Tex. App.— Dallas 2005, no pet.). He insists, however, that these holdings were erroneous

because defining a word includes fixing or marking its limits, which he argues is what paragraph [3] does with respect to "reasonable doubt."

We reject this argument, as we have on numerous occasions.[2] As an intermediate court, we are bound to follow the decisions of the court of criminal appeals. *Chatham v. State*, 646 S.W.2d 512, 513 (Tex. App.—Dallas 1982, no pet.). That Court held in *Woods* and *Mays* that a trial court does not err by including paragraph [3] of the *Geesa* instruction in its charge to the jury. Appellant provides nothing to distinguish the case before us from court of criminal appeals precedent.

---

[2] *Lane v. State*, No. 05-21-01037-CR, 2022 WL 16706966, at *4 (Tex. App.—Dallas Nov. 4, 2022, no pet.) (mem. op., not designated for publication); *Dickerson v. State*, No. 05-20-00339-CR, 2021 WL 5410523, at *1 (Tex. App.—Dallas Nov. 19, 2021, no pet.) (mem. op., not designated for publication); *Jackson v. State*, No. 05-19-01043-CR, 2021 WL 791095, at *4 (Tex. App.—Dallas Mar. 2, 2021, pet. ref'd) (mem. op., not designated for publication); *Keller v. State*, 604 S.W.3d 214, 231 (Tex. App.—Dallas, pet. ref'd); *Gomez v. State*, No. 05-19-00352-CR, 2020 WL 3046206, at *3 (Tex. App.—Dallas June 8, 2020, no pet.) (mem. op., not designated for publication); *Thomas v. State*, No. 05-19-00347-CR, 2020 WL 2988639, at *7 (Tex. App.—Dallas June 4, 2020, pet. ref'd) (mem. op., not designated for publication); *Benton v. State*, No. 05-18-01024-CR, 2020 WL 2124179, at *3 (Tex. App.—Dallas May 5, 2020, pet. ref'd) (mem. op., not designated for publication); *Wilson v. State*, No. 05-18-00801-CR, 2019 WL 3491931, at *3 (Tex. App.—Dallas Aug. 1, 2019, no pet.) (mem. op., not designated for publication); *Dickerson v. State*, No. 05-18-00949-CR, 2019 WL 2865273, at *3 (Tex. App.—Dallas July 3, 2019, no pet.) (mem. op., not designated for publication); *Backusy v. State*, No. 05-17-01288-CR, 2018 WL 5730166, at *3 (Tex. App.—Dallas Nov. 2, 2018, pet. ref'd) (mem. op., not designated for publication); *Chapin v. State*, No. 05-15-01009-CR, 2016 WL 4421570, at *4 (Tex. App.—Dallas Aug. 19, 2016, no pet.) (mem. op., not designated for publication); *Barroquin-Tabares v. State*, No. 05-15-00794-CR, 2016 WL 3144160, at *3 (Tex. App.—Dallas May 31, 2016, no pet.) (mem. op., not designated for publication); *Finch v. State*, No. 05-15-00793-CR, 2016 WL 2586142, at *7 (Tex. App.—Dallas May 4, 2016, pet. ref'd) (mem. op., not designated for publication); *Jamison v. State*, No. 05-15-00086-CR, 2016 WL 1725489, at *5 (Tex. App.—Dallas Apr. 27, 2016, pet. ref'd) (mem. op., not designated for publication); *Moran v. State*, No. 05-15-00606-CR, 2016 WL 748498, at *5 (Tex. App.—Dallas Feb. 25, 2016, no pet.) (mem. op., not designated for publication); *Walker v. State*, No. 05-14-01229-CR, 2016 WL 259577, at *6 (Tex. App.—Dallas Jan. 21, 2016, pet. ref'd) (mem. op., not designated for publication); *Carus v. State*, No. 05-14-00272-CR, 2015 WL 9485951, at *4 (Tex. App.—Dallas Dec. 29, 2015, no pet.) (mem. op., not designated for publication); *Paz v. State*, No. 05-14-01127-CR, 2015 WL 6386424, at *9 (Tex. App.—Dallas Oct. 22, 2015, no pet.) (mem. op., not designated for publication); *Barradas v. State*, No. 05-14-01271-CR, 2015 WL 6157169, at *6 (Tex. App.—Dallas Oct. 20, 2015, no pet.) (mem. op., not designated for publication); *Washington v. State*, No. 05-14-00604-CR, 2015 WL 4178345, at *7 (Tex. App.—Dallas July 10, 2015, no pet.) (mem. op., not designated for publication); *Hargrove v. State*, No. 05-11-00307-CR, 2012 WL 3553501, at *9 (Tex. App.—Dallas Aug. 20, 2012, pet. ref'd) (mem. op., not designated for publication) (citing *Mays*, 318 S.W.3d at 389); *O'Canas v. State*, 140 S.W.3d 695, 700–02 (Tex. App.—Dallas 2003, pet. ref'd).

We again follow these holdings, as we must, and conclude that the inclusion of the same paragraph in this case was not error. We overrule appellant's fourth issue.

## IV. JURISDICTION

In his fifth issue, appellant contends that the trial court, the 265th District Court, lacked jurisdiction over this case because the 204th District Court, which empaneled the grand jury that returned his indictment, did not enter an order of transfer. "When a defendant fails to file a plea to the jurisdiction, he waives any right to complain that a transfer order does not appear in the record." *Keller v. State*, 604 S.W.3d 214, 231 (Tex. App.—Dallas, pet. ref'd); *see also Mills v. State*, 742 S.W.2d 831, 834–35 (Tex. App.—Dallas 1987, no pet.).

We have rejected this issue in over seventy-five prior cases in which this counsel represented an appellant.[3] Each time, counsel's brief acknowledged that his position is against current authority.[4] Here, counsel specifically cites *Mills*, 742

---

[3] Just in the past few years, counsel raised the issue in the following cases: *Lane*, 2022 WL 16706966, at *5; *Rivera v. State*, No. 05-20-00300-CR, 2022 WL 214098, at *5 (Tex. App.—Dallas Jan. 25, 2022, no pet.) (mem. op., not designated for publication); *Dickerson*, 2021 WL 5410523, at *1; *Kessler v. State*, No. 05-20-00221-CR, 2021 WL 5002423, at *2 (Tex. App.—Dallas Oct. 28, 2021, no pet.) (mem. op., not designated for publication); *Canamargarza v. State*, No. 05-20-00074-CR, 2021 WL 3729311, at *2 (Tex. App.—Dallas Aug. 23, 2021, no pet.) (mem. op., not designated for publication); *Pedroza v. State*, No. 05-19-01570-CR, 2021 WL 804416, at *2 (Tex. App.—Dallas Mar. 3, 2021, no pet.) (mem. op., not designated for publication); *Jackson*, 2021 WL 791095, at *6; *Fajardo*, 2021 WL 688444, at *3; *Murphy*, 2020 WL 7396009, at *4; *Keller*, 604 S.W.3d at 231; 2020 WL 3046206, at *3; *Benton*, 2020 WL 2124179, at *3; *Epps v. State*, No. 05-19-00066-CR, 2019 WL 6799753, at *1 (Tex. App.—Dallas Dec. 13, 2019, no pet.) (mem. op., not designated for publication); *Delarosa v. State*, No. 05-18-01507-CR, 2019 WL 6317865, at *1 (Tex. App.—Dallas Nov. 26, 2019, no pet.) (mem. op., not designated for publication); *Johnson v. State*, No. 05-18-01230-CR, 2019 WL 6317866, at *2 (Tex. App.—Dallas Nov. 26, 2019, no pet.) (mem. op., not designated for publication).

[4] *See*, *e.g.*, *Antonio v. State*, 05-13-00747-CR, 2014 WL 2583764, at *3 (Tex. App.—Dallas June 10, 2014, pet. ref'd) (mem. op., not designated for publication) ("Appellant did not file a plea to the jurisdiction. Moreover, appellant admits the case law is well-settled against him and appears to ask us to revisit the issue

S.W.2d at 835, and *Garcia v. State*, 901 S.W.2d 731, 733 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd), as examples of cases holding that a challenge to the lack of a transfer order must be raised in the trial court or be waived on appeal. He argues, however, that all such cases "simply cite to their antecedents without any Constitutional or statutory authority for the proposition that a jurisdictional defect can be cured by procedural default." This statement mischaracterizes not just the holding of *Mills* and *Garcia*, but also the entire body of case law on this issue. Neither *Mills*, *Garcia*, nor to our knowledge any other case in Texas, has held that "a jurisdictional defect can be cured by procedural default" on these facts. Rather, as we have held time and time again, *there is no jurisdictional defect*. *See Jackson*, 2021 WL 791095, at *6 (explaining that the "fallacy of appellant's argument" is absence of transfer order is a procedural, not a jurisdictional defect); *Fajardo v. State*, No. 05-19-01277–01279-CR, 2021 WL 688444, at *3 (Tex. App.—Dallas Feb. 23, 2021, no pet.) (mem. op., not designated for publication) ("[T]he lack of a transfer order 'is a procedural matter, not a jurisdictional one.'"). Appellant failed to file a plea to the jurisdiction in the trial court and, absent an equivalent objection, waived the issue under our long-standing precedent. *Mills*, 742 S.W.2d at 835.

---

because the cases 'simply cite to their antecedents without any Constitutional or statutory authority for the proposition that a jurisdictional defect can be cured by procedural default.' We decline his invitation to revisit the issue.") (citing *Goff v. State*, No. 05-13-00876-CR, 2014 WL 259668, at *5 (Tex. App.—Dallas Jan.22, 2014, no pet.) (mem. op., not designated for publication) (declining invitation to reconsider transfer order issue for the same reasons)).

Even if appellant's fifth issue had been preserved, we would find no error because the record unequivocally shows that the 265th District Court possessed jurisdiction over this case. Jurisdiction lies in the court in which the indictment or complaint is first filed. *See* TEX. CODE CRIM. PROC. ANN. art. 4.16. "When two or more courts have concurrent jurisdiction of any criminal offense, the court in which an indictment or a complaint shall first be filed shall retain jurisdiction except as provided in Article 4.12."[5] TEX. CODE CRIM. PROC. ANN. art. 4.16; *see also Mills*, 742 S.W.2d at 834–35. The record reflects that although appellant was indicted by a grand jury empaneled by the 204th District Court, the indictment was filed, and the case tried, in the 265th District Court. Thus, even if appellant had preserved this issue, the record would reflect no reversible error. *Murphy v. State*, No. 05-19-00886-CR, 2020 WL 7396009, at *3 (Tex. App.—Dallas Dec. 17, 2020, no pet.) (mem. op., not designated for publication) (transfer order unnecessary where the record reflected that the indictment was first filed in the court in which the case was tried); *Bourque*, 156 S.W.3d at 678.

We therefore overrule appellant's fifth issue.

---

[5] Article 4.12 is inapplicable here, as it governs jurisdiction over misdemeanor cases. *See* TEX. CODE CRIM. PROC. ANN. art. 4.12.

## CONCLUSION

Having overruled appellant's issues, we affirm the judgment of the trial court.


/Bonnie Lee Goldstein/
BONNIE LEE GOLDSTEIN
JUSTICE

Publish
TEX. R. APP. P. 47.2(b)
210626F.P05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

CURTIS TYRONE BULLOCK,
Appellant

No. 05-21-00626-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 265th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. F19-14101-R.
Opinion delivered by Justice
Goldstein. Justices Reichek and
Kennedy participating.


Based on the Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.


Judgment entered this 20th day of July, 2023.